## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

—————————————————————

LEON H. RIDEOUT,
ANDREW LANGLOIS, and
BRANDON D. ROSS,

     Plaintiffs,

v.

WILLIAM M. GARDNER, Secretary of
State of the State of New Hampshire, in his
official capacity,

     Defendant

—————————————————————

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Case. No. 1:14-cv-00489-PB

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION
### (ORAL ARGUMENT REQUESTED)

Now come Plaintiffs Leon H. Rideout, Andrew Langlois, and Brandon Ross and respectfully offer this Memorandum of Law in Support of Their Motion for a Preliminary Injunction.

### INTRODUCTION AND SUMMARY OF ARGUMENT

This Motion asks the Court to immediately enjoin the State's enforcement of RSA 659:35(I) on the grounds that it violates free speech rights under the First and Fourteenth Amendments to the United States Constitution. RSA 659:35(I), which became effective on September 1, 2014, bans a person from displaying a photograph of a marked ballot reflecting "how he or she has voted," including on the Internet through social media platforms like Twitter, Facebook, and Instagram. The law contains no exceptions. Now, willfully engaging in this form of innocent, political speech is a violation-level offense punishable by a fine of up to $1,000.

RSA 659:35(I) encroaches upon the First Amendment by banning voluntary political

speech on matters of public concern occurring outside the polling place (including in one's home) that is unrelated to the State's purported interest in enacting the law: to address vote buying and voter coercion. As explained below, the law is facially unconstitutional for two separate and independent reasons. _First_, RSA 659:35(I) is a content-based restriction on political speech, as the law prohibits the revelation of specific content—namely, a marked ballot demonstrating how a person "has voted." Thus, this law must be narrowly tailored to serve a compelling governmental interest. Here, even if addressing vote corruption is a compelling governmental interest, the law cannot possibly be viewed as a narrowly-tailored means to address this interest because the law bans innocent, political speech. The more tailored approach would be to investigate and prosecute vote-buying transactions and incidents of voter coercion—conduct which is already illegal under RSA 659:40(I-II). Simply put, the First Amendment does not allow the State to, as it is doing here, broadly ban innocent, political speech with the hope that such a sweeping ban will address underlying criminal conduct.

_Second_, RSA 659:35(I) is facially unconstitutional because it is substantially overbroad. A statute is facially overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." _United States v. Stevens_, 559 U.S. 460, 473 (2010) (internal quotation marks and citations omitted). What the law ignores is that displaying a photograph of a marked ballot on the Internet is a powerful form of political speech that conveys various constitutionally-protected messages that have no relationship to vote buying or voter coercion. In fact, New Hampshire appears to be the only state in the country to update its decades-old election laws during the Internet age with the specific intent to ban this form of online political speech occurring outside the polling place.[1] For example, an 18-year-old, newly-minted

---

[1] The Court can take judicial notice of the following sources analyzing the laws of other states. _See_ Digital Media Law Project, "State Law: Documenting the Vote 2012," http://www.dmlp.org/state-law-documenting-vote-2012 (last

voter who is excited about voting in her first presidential election and wishes to publicly show on Facebook her enthusiastic support for a candidate using the powerful imagery of the very document she used to participate in the democratic process is now prohibited from doing so. Under the law, a husband is also prohibited from displaying a photograph of his marked ballot to his wife in the privacy of their own home days (or even months or years) after the election to show his pride for having supported certain candidates. Because RSA 659:35(I) sweeps within its scope protected political speech, it is unconstitutional on its face.

A preliminary injunction is necessary because the New Hampshire Attorney General's Office is enforcing RSA 659:35(I). For example, the Attorney General's Office has stated publicly that it will enforce the law against those who posted photographs of their marked ballots following the November 4, 2014 general election. As the Attorney General's Office told the *Concord Monitor* in an article published on November 7, 2014, "We're still enforcing the law as it is currently written." *See* Affidavit of Gilles Bissonnette (hereinafter, "Biss. Aff.") ¶ 2, <u>*Exhibit A*</u> (Nov. 7, 2014 *Concord Monitor* Article) (reporting that "[d]ozens of ['ballot selfie'] photos popped up on social media Tuesday"). Now, multiple individuals who engaged in this form of protected speech following the November 4, 2014 general election risk prosecution under RSA 659:35(I), and others are chilled from engaging in this speech.

The State has also investigated voters for publishing their marked ballots during the September 9, 2014 primary election. For example, the Attorney General's Office is currently investigating Plaintiff Andrew Langlois under the law for speech he engaged in during this

visited Nov. 10, 2014); Amanda Terkel and Dana Liebelson, "A Guide To Not Getting Arrested When You Use Your Cell Phone On Election Day," *Huffington Post* (Nov. 3, 2014), http://www.huffingtonpost.com/2014/11/03/photo-polling-place_n_6095746.html. In 2011 and 2014, Maine and Oregon, respectively, also repealed laws banning the display of a marked ballot. *See* 21-A M.R.S. § 674(1)(D) (repealed section that prohibited the showing of a "marked ballot to another with the intent to reveal how that person voted"); 2014 Oregon Senate Bill 1504, https://olis.leg.state.or.us/liz/2014R1/Downloads/MeasureDocument/SB1504/Enrolled (effective January 1, 2015, repealing language in Or. Rev. Stat. § 260.695(7) stating that "[a] person may not show the person's own marked ballot to another person to reveal how it was marked").

election.  On Mr. Langlois' marked ballot that he later published on Facebook, he wrote the name of his recently-deceased dog "Akira" as his Republican choice for U.S. Senate.  Mr. Langlois' vote and the publication of his ballot on Facebook were acts of protest against his choices for Senate—each of whom he disapproved.  Plaintiff Representative Leon H. Rideout has also been investigated under RSA 659:35(I) for posting his marked ballot on Twitter during the September 9, 2014 primary election.[2]

The imposition of this unconstitutional law threatens irreparable harm to Plaintiffs' free speech rights.  Yet, despite this law's substantial overbreadth and lack of tailoring, the State's enforcement of the law persists unabated and will inhibit innocent, political speech far beyond the vote corruption conduct that the law aims to address.  As the First Circuit recently noted, "First Amendment rights are fragile, and it is not only the occasional abuse of censorship power but also the threat inherent in the existence of that power that may chill protected expression."  *Van Wagner Boston, LLC v. Davey*, No. 13-2087, — F.3d —, 2014 U.S. App. LEXIS 20065, at *1 (1st Cir. Oct. 20, 2014).   Accordingly, Plaintiffs respectfully request an immediate preliminary injunction barring enforcement of RSA 659:35(I) while this lawsuit is pending.

## FACTS

### I.     HB 366 And The Purported Governmental Interests Behind It.

Effective September 1, 2014, RSA 659:35(I) was modified to state the following: "No

---

[2] In light of Plaintiffs' Motion for Preliminary Injunction, the State has agreed to temporarily not enforce RSA 659:35(I) until the date of any decision from the Court on this Motion or until (i) Friday, December 19, 2014, for violations arising out of the State General Election held on November 4, 2014 and (ii) Friday, December 5, 2014, for violations arising out of the State Primary Election held on September 9, 2014, whichever is sooner.  Under this arrangement, individuals who posted photographs of their marked ballots at or around the time of the November 4, 2014 general election still run the risk of liability until February 4, 2015, as the statute of limitations for a violation of RSA 659:35(I) is 90 days.  *See* RSA 625:8(1)(d).  Moreover, it is important to note that liability under RSA 659:35(I) is not tethered to the date of the election, but rather to the date the marked ballot is actually displayed.  Thus, notwithstanding the State's temporary agreement, persons are still prohibited under the law from posting or reposting online photographs of their marked ballots from the September 9, 2014 primary election on, for example, February 5, 2015, despite the fact that this posting would occur over 90 days after the primary election.  The 90-day statute of limitations would then run from the date of the online publication.

voter shall allow his **_or her_** ballot to be seen by any person with the intention of letting it be known how he **_or she_** is about to vote **_or how he or she has voted_** except as provided in RSA 659:20.[3] **_This prohibition shall include taking a digital image or photograph of his or her marked ballot and distributing or sharing the image via social media or by any other means_**." (bolded, italicized, and underlined language reflect the modifications that became effective on September 1, 2014) (hereinafter, "HB 366"). A willful violation of this statute is a violation-level offense. RSA 659:35(IV). Violations are punishable by a fine not to exceed $1,000. RSA 651:2(IV)(a).

Under the prior version of RSA 659:35(I), it was unlawful to display one's marked ballot reflecting how one was "about to vote." As a result, the law effectively only burdened speech on election day inside the polling place between the moment a voter marked the ballot and the moment the voter placed the ballot in the ballot box. The law dates back to the early 1890s, and was codified as RSA 659:35(I) in 1979.

The purported governmental interest behind HB 366 is to address vote buying and voter coercion. According to Deputy Secretary of State David M. Scanlan's April 9, 2014 testimony before the Senate Public and Municipal Affairs Committee, HB 366 was necessary to update the law in light of modern technology to address vote buying, which he argued was "rampant" in the decades prior to the 1890s. He expressed fear that "we have this great new technology now that allows people to go in the polling place, to take an image of their ballot before they put it in the ballot box, and then distribute it instantly to whomever and wherever they want to distribute it.

---

[3] RSA 659:20, entitled "Assistance in Voting," states the following: "Any voter who declares to the moderator under oath that said voter needs assistance marking his or her ballot shall, upon the voter's choice and request after the moderator has informed the voter of the accessible voting options that are available at the polling place, receive the assistance of one or both of the inspectors of election detailed for that purpose by the moderator or of a person of the voter's choice provided that the person is not the voter's employer or union official. Such person so assisting shall be sworn, shall mark the ballot as directed by said voter, and shall thereafter give no information regarding the same. Such person so assisting shall leave the space within the guardrail with the voter."

[This] creates a new opportunity to go back to the days prior to the 1890s when votes could be bought and purchased." Biss. Aff. ¶ 3, *Exhibit B* (Recording of Apr. 9, 2014 Hearing) (13:35; 15:34). Deputy Secretary Scanlan did not cite a single incident of vote buying in New Hampshire since the 1890s, let alone a vote buying transaction that was consummated by the display of a marked ballot on the Internet.[4] As the Attorney General's Office further explained to the press: "The idea is, 'You can't verify that I voted as you asked me to vote or you gave me consideration to vote.'" Biss. Aff. ¶ 5, *Exhibit D* (Sept. 24, 2014 *WMUR* Story).

Similarly, in testimony by Representative Timothy Horrigan—the sponsor of HB 366— before the Senate Public and Municipal Affairs Committee on April 9, 2014, he stated that HB 366 was designed, in part, to address a "scheme [where] somebody is trying to buy votes and they … make you take a picture of their ballot on their cell phone and go out and show it to a guy and he hands you a $5 or $10 bill." Biss. Aff. ¶ 3, *Exhibit B* (Recording of Apr. 9, 2014 Hearing) (5:17). Representative Horrigan further testified that he did not know if anyone had "done such a scheme," but that it was worth making it illegal anyway. *Id.* (5:30); *see also* Biss. Aff. ¶ 6, *Exhibit E* (Representative Timothy Horrigan's Website Addressing HB 366). Representative Mary Till of the House Election Law Committee also testified in favor of HB 366 before the Senate Public and Municipal Affairs Committee on April 9, 2014. She argued that the law would help ensure that "no one is coerced to vote in a particular way." She expressed concern that "someone with authority over the voter—for example, an employer, a union [representative], or a spouse—could coerce the voter into providing a photo of his or her completed ballot to prove that they voted the way they were told to vote." Biss. Aff. ¶ 3, *Exhibit B* (Recording of Apr. 9, 2014 Hearing)

---

[4] Deputy Secretary Scanlan echoed these same sentiments to the *New Hampshire Union Leader* following the September 9, 2014 primary election: "In the 1880s, [vote buying] was a real problem …. It was easy to see how someone voted and it was not unusual to pay as much as $10 a vote …. With digital technology, that door was opening again … where you could take a selfie of your ballot and post it on Facebook showing how you voted." Biss. Aff. ¶ 4, *Exhibit C* (Sept. 20, 2014 *New Hampshire Union Leader* Article).

(8:14).[5]

On September 22, 2014, the New Hampshire Civil Liberties Union ("NHCLU") submitted Right-to-Know records requests to both the Secretary of State's Office and the Office of the Attorney General concerning HB 366.  Biss. Aff. ¶¶ 8-9, *Exhibit G and H* (Sept. 22, 2014 Right-to-Know Requests).  In the documents produced in late October 2014, the State failed to present a single incident in which a marked ballot was displayed through the Internet to engage in vote bribery or voter coercion.  Biss. Aff. ¶¶ 10-11, *Exhibit I and J* (documents produced by the State).

## II.     The Plaintiffs And The State's Enforcement Of RSA 659:35(I) After September 1, 2014.

Since HB 366 was passed, the New Hampshire Attorney General's Office has enforced RSA 659:35(I) and has been actively investigating individuals who posted their marked ballots on the Internet, regardless of whether this speech is related to the State's asserted interests in passing the law.

### A.     Plaintiff Representative Leon H. Rideout

Plaintiff Leon H. Rideout is a member of the House of Representatives representing District 7 in Coos County.  He voted during the September 9, 2014 Republican primary election in Lancaster where he was on the ballot.  During the primary election, he took a photograph of his marked ballot with his phone prior to casting the ballot.  The marked ballot reflected that he voted for himself as well as other Republican candidates.  Hours after the ballot was cast, Representative Rideout posted the photograph on Twitter, along with the text "#COOS7 vote in primary 2014#nhpolitics."  Amended Verified Complaint ("AVC") ¶¶ 31-32.

As Representative Rideout explained to the *Nashua Telegraph*, "I did it to make a

---

[5] It should also be noted that, in a statement to the press prior to the November 4, 2014 election, Secretary of State William M. Gardner stated that "[i]f people can bring cameras into the polling place, they can … take pictures of your ballot without you knowing it."  Biss. Aff. ¶ 7, *Exhibit F* (Nov. 4, 2014 *NH1* Story).  This statement bears no relationship to RSA 659:35(I).  RSA 659:35(I) addresses the ability of a person to voluntarily display his or her own marked ballot, not the ability of a person to take a photograph of another person's ballot.

statement …. I had promised a few other [representatives] that I would post my ballot, and I did …. I think [RSA 659:35(I) is] unconstitutional …. It's really just an overreach of the government trying to control something that, in my opinion, doesn't need to be regulated."  Biss. Aff. ¶ 12, _Exhibit K_ (Sept. 11, 2014 _Nashua Telegraph_ Article).  Representative Rideout's posting had nothing to do with vote corruption.  AVC ¶ 32.

At or around the time of the publication of this _Nashua Telegraph_ article on September 11, 2014, the New Hampshire Attorney General's Office initiated an investigation of Representative Rideout for violating RSA 659:35(I).  Paul Brodeur, an investigator from the Attorney General's Office, called Representative Rideout and requested an interview.  As Representative Rideout described the interview to the _Nashua Telegraph_: "I told [Mr. Brodeur during the interview that] I disagreed with the thought [behind the law] …. [I]t was a violation of freedom of speech.  If somebody wants to post their ballot, it should be up to them.  It definitely shouldn't be a criminal act."  Biss. Aff. ¶ 13, _Exhibit L_ (Sept. 19, 2014 _Nashua Telegraph_ Article); _see also_ AVC ¶¶ 32-33.

Following the submission of a Right-to-Know records request to the Attorney General's Office by the NHCLU, the Attorney General's Office confirmed in late October 2014 that Representative Rideout is still being investigated for violating RSA 659:35(I) and that his file is "open."  Biss. Aff. ¶ 14.

### B.    Plaintiff Andrew Langlois

The Attorney General's Office is also investigating Plaintiff Andrew Langlois for violating RSA 659:35(I).  Mr. Langlois voted during the September 9, 2014 Republican primary election in Berlin.  Because Mr. Langlois did not approve of his Republican choices for U.S. Senate, Mr. Langlois wrote the name "Akira" as a write-in candidate.  "Akira" is the name of Mr. Langlois' dog that passed away just days before the primary election.  Prior to casting the marked ballot, Mr.

Langlois took a photograph of the ballot's U.S. Senate section with his phone while in the ballot booth. He then went home and posted the photograph on Facebook, along with commentary reflecting his frustration with his Republican choices for U.S. Senate. In short, Mr. Langlois' posting was a protest against his choices for public office—a political message that would have been far less salient without the photograph indicating that his deceased dog "Akira" was his candidate of choice. AVC ¶¶ 35-36. Mr. Langlois' posting had nothing to do with vote corruption. *Id.* ¶ 36.

After the primary election, Mr. Langlois received a phone call from investigator Paul Brodeur. Mr. Brodeur explained that Mr. Langlois was being investigated for posting his ballot on social media in violation of RSA 659:35(I). At first, Mr. Langlois could not believe that what he did was illegal. He told Mr. Brodeur that the phone call must be some sort of "joke." Mr. Langlois expressed surprise that the State would be investigating someone for posting a photograph of a ballot indicating that a voter had voted for his dog. *Id.* ¶ 37.

Following the submission of a Right-to-Know records request to the Attorney General's Office by the NHCLU, the Attorney General's Office confirmed in late October 2014 that Mr. Langlois is still being investigated for violating RSA 659:35(I) and that his file is "open." Biss. Aff. ¶ 15.

C. **Plaintiff Brandon D. Ross**

Plaintiff Brandon D. Ross voted during the September 9, 2014 Republican primary election in Manchester. Mr. Ross was a candidate on the ballot at the time, as he was running to be one of two Republican nominees to represent District 42's two seats in the New Hampshire House of Representatives (which represents Wards 1 through 3 in Manchester). After Mr. Ross marked his ballot with his choices and prior to the ballot being cast, he took a photograph of the ballot with his phone. His marked ballot reflected that he was voting for himself, as well as other

Republican candidates. Mr. Ross took this picture to keep a record of his vote, to assist him in the future with remembering other candidates for whom he voted, and to preserve the opportunity to show his marked ballot to friends as a means of demonstrating his support for certain political candidates. Mr. Ross was aware of RSA 659:35(I) when he took this photograph, but— demonstrating the chilling effect of the law—he did not immediately publish the photograph because of the law's penalties. AVC ¶ 39.

Over one week later, Mr. Ross became aware that the New Hampshire Attorney General's Office was investigating voters for violating RSA 659:35(I). In response, on September 19, 2014, Mr. Ross posted the photograph of his marked ballot on Facebook with the text "Come at me bro." The text symbolized his political objection to RSA 659:35(I) on free speech grounds and his deep concern about the Attorney General's investigations of qualified voters. In short, the picture, combined with the text, was a form of political protest and a statement that he was willing to risk prosecution in order to stand up for his First Amendment rights. *Id.* ¶ 40. Mr. Ross's posting had nothing to do with vote corruption. *Id.* ¶ 41.

## ANALYSIS

In determining whether to grant preliminary injunctive relief, the Court must consider whether the plaintiff has established four factors: "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Bruns v. Mayhew*, 750 F.3d 61, 65 (1st Cir. 2014) (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). The first factor—the likelihood of success on the merits—is the predominate factor in this determination. *Corporate Technologies v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013); *see also Sindicato Puertorriqueno de Trabajadores v. Fortuno* 699 F.3d 1, 10 (1st Cir. 2012) ("In the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary

injunction analysis.").  All of these factors weigh in favor of a preliminary injunction here.

I.    **Plaintiffs Have Shown A Likelihood Of Success On The Merits.**

The United States Supreme Court "has characterized the freedom of speech and that of the press as fundamental personal rights and liberties.  The phrase is not an empty one and [is] not lightly used."  *Schneider v. New Jersey*, 308 U.S. 147, 161 (1939) (footnote omitted).  "It has become axiomatic that '[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms.'"  *United States v. Robel*, 389 U.S. 258, 265 (1967) (quoting *NAACP v. Button*, 371 U.S. 415, 438 (1963)).  For the two independent reasons below, RSA 659:35(I), on its face, violates the First Amendment and should be enjoined.

A.    **RSA 659:35(I) Fails Strict Scrutiny And, Therefore, Is Facially Unconstitutional Under The First Amendment.**

1.    **RSA 659:35(I) Triggers Strict Scrutiny Because (i) It Is Content-Based And (ii) Forbids The Dissemination Of Truthful And Lawfully-Obtained Information On A Matter Of Public Concern.**

Content-based restrictions are presumptively invalid, *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992), and are permitted only if they are narrowly tailored to promote a compelling governmental interest.  *See Vono v. Lewis*, 594 F. Supp. 2d 189, 204 (D.R.I. 2009).

RSA 659:35(I) is a content-based restriction because it prohibits the revelation of specific content—namely, a marking on a ballot demonstrating how a voter "has voted."  A ballot omitting this content—even if it contains other handwritten messages—is not subject to the law's prohibitions.  Whether an individual runs afoul of the law depends entirely on whether the markings on the individual's ballot indicate how a person has specifically voted.  *See Burson v. Freeman*, 504 U.S. 191, 197 (1992) (law banning the display or distribution of campaign materials within 100-feet of the entrance to a polling place on election day was content based because "[w]hether individuals may exercise their free speech rights near polling places [under the law]

depends entirely on whether their speech is related to a political campaign").  Put another way, the law is content based because it requires the government to examine the content of a ballot to determine whether the law has been violated.  Indeed, it is the very message constituting the display of a marked ballot that the State is banning under the law.  *See McCullen v. Coakley*, 134 S. Ct. 2518, 2531 (2014) (A law is "content based if it require[s] 'enforcement authorities' to 'examine the content of the message that is conveyed to determine whether' a violation has occurred.") (quoting *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 383 (1984)).[6]

If there was any further doubt, the United States Supreme Court also recently explained in *McCullen v. Coakley* that a law is content based "if it [is] concerned with undesirable effects that arise from 'the direct impact of speech on its audience' or '[l]isteners' reactions to speech." *McCullen*, 134 S. Ct. at 2531; *see also Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134 (1992) ("Listeners' reaction to speech is not a content-neutral basis for regulation.").  Here, the law's blanket prohibition exists because the State specifically disapproves of messages conveyed through the dissemination of marked ballots because of perceived undesirable effects. This is the very definition of a content-based regulation requiring strict scrutiny review.[7]

RSA 659:35(I) triggers strict scrutiny for another independent reason: the law forbids "the dissemination of truthful and lawfully obtained information on a matter of public concern." *Florida Star v. B.J.F.*, 491 U.S. 524, 541 (1989).  Thus, the law "must meet a daunting standard"—namely, "punishment may lawfully be imposed, if at all, only when narrowly tailored to a state interest of the highest order[.]"  *Id.* (statute prohibiting instruments of mass

---

[6] *See also Forsyth County v. Nationalist Movement*, 505 U.S. 123, 135-36 (1992) (law is content based where it discriminates on the basis of the content of the message); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995) (law banning anonymous campaign literature was content based because "the category of covered documents is defined by their content—only those publications containing speech designed to influence the voters in an election").

[7] *See Cutting v. City of Portland*, No. No. 2:13-cv-359-GZS, 2014 U.S. Dist. LEXIS 17481, at *28 (D. Me. Feb. 12, 2014) ("A law may no more favor one type of message because of agreement with it than it may disfavor a message because of disapproval.").

communication from publishing the names of rape victims failed strict scrutiny review). Here, it cannot seriously be disputed that speech concerning an election is a "matter of public concern." The speech being suppressed by this law is not just imagery depicting the identity of the candidate for whom a person voted; rather, the law bans individuals from voluntarily using photographs of marked ballots to more broadly engage in political commentary and discuss both their experience at the polls and reasons for voting for certain candidates.

### 2. RSA 659:35(I) Is Not Narrowly Tailored To Serve A Compelling Governmental Interest.

Even if there is a compelling governmental interest in addressing vote buying and voter coercion, the State has no interest—let alone a compelling one—in regulating innocent, political speech far beyond the polling place that is unrelated to this asserted interest. To suppress such speech creates the real prospect of self-censorship and limits the breathing space for protected First Amendment expression. *See Watts v. United States*, 394 U.S. 705, 708 (1969) (explaining our country's "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open"). Moreover, the State has presented no evidence either in the legislative history of HB 366 or in pre-litigation discovery indicating that a photograph of a marked ballot has ever been displayed through the Internet as part of a scheme to buy a vote or engage in voter coercion. *See* Biss. Aff. ¶¶ 10-11, *Exhibit I and J.*

RSA 659:35(I) also cannot be viewed as a narrowly-tailored means of addressing vote buying and voter coercion when the law sweeps within its scope speech wholly unrelated to these interests—including the political speech engaged in by Plaintiffs. *See Reno v. ACLU*, 521 U.S. 844, 879 (1997) (Communications Decency Act of 1996 criminalizing the "knowing" transmission of "obscene or indecent" messages to any recipient under 18 years of age violated the First Amendment because it was not narrowly tailored to the goal of protecting minors from

potentially harmful materials given the "breadth of this content-based restriction of speech");

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 350 (1995) (ban on dissemination of anonymous campaign literature not narrowly tailored to interests of deterring fraud and libel because "the prohibition encompasses documents that are not even arguably false or misleading").

It is already illegal to engage in vote bribery and voter coercion under RSA 659:40(I-II). These laws do not—unlike RSA 659:35(I)—sweep within their scope a wide array of innocent, political speech. The United States Supreme Court's recent analysis in *McCullen v. Coakley* of whether Massachusetts' 35-foot abortion clinic buffer zone was narrowly tailored is instructive here. There, the Court first observed that the law had reduced petitioners' opportunities to effectively speak with their intended audience through face-to-face communications. *McCullen*, 134 S. Ct. at 2535. The Court then explained that there were ample alternatives that would more directly address the government's asserted public safety interests without substantially burdening this speech, including "criminal statutes forbidding assault, breach of the peace, trespass, vandalism, and the like." *Id.* at 2538. The same is true here where the more narrowly-tailored response would be to aggressively investigate and prosecute violations of RSA 659:40.[8] Indeed, if a person publicly posts a picture of a marked ballot on the Internet showing how he or she voted, the State could easily identify and investigate the voter for a potential violation of RSA 659:40. Here, the State has not shown that the posting of displayed ballots on the Internet is even linked to violations of RSA 659:40, let alone shown, as required by *McCullen*, "that it seriously undertook to address the problem with less intrusive tools readily available to it." *McCullen*, 134 S. Ct. at 2539.

The State likely will argue that RSA 659:35(I) is necessary because a photograph of a

---

[8] *See also State v. Chong*, 121 N.H. 860, 862 (1981) (anti-leafleting law was unconstitutional because "[i]f the defendants were to litter, they could, of course, be charged with that violation").

marked ballot is the best evidence that a person who is selling a vote or has been coerced can present to a third party to prove that he or she voted a certain way. In other words, the State's argument is that this law makes it much easier to eliminate vote buying and voter coercion because it discourages an act that is necessary to consummate this illegal conduct. Even if this was true, this does not solve the law's narrow tailoring problem or remedy the fact that the law sweeps within its scope innocent political speech. As the United States Supreme Court recently made clear in *McCullen*, "[t]o meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *Id.* at 2540. The State cannot make such a showing here. The First Amendment cannot be sacrificed for the sake of efficiency.

Any argument by the State that RSA 659:35(I) is a tailored regulation governing speech in polling places on election day also fails. *See Burson*, 504 U.S. at 197 (law banning solicitation of votes and the display or distribution of campaign materials within 100-feet of the entrance to a polling place on election day survived strict scrutiny). Unlike the law in *Burson* that was limited only to political speech on election day and at the polling place, RSA 659:35(I) is far broader in duration and scope. For example, the law indefinitely bans the posting of one's ballot on the Internet, including postings made *months or even years after the election*. In Plaintiff Brandon D. Ross's case, he published his ballot on Facebook 10 days after the primary election. AVC ¶ 40. Any concerns the State may have about voter coercion on election day are only relevant while the voting process is in progress, not weeks, months, or even years after the election. In fact, RSA 659:35(I) contained such a temporal restriction before it was amended by HB 366, as it initially only limited the display of a marked ballot indicating how one is "about to vote." Thus, the prior version of the law was effectively circumscribed to the disclosure of one's ballot in the polling

place on election day before the ballot was actually cast. The current version of RSA 659:35(I), however, prohibits a voter from uploading to Facebook a photograph of a marked ballot *in places other than in the polling place*, including in the privacy of one's home. In fact, all the plaintiffs in this case uploaded photographs of their marked ballot after they had left the polling place. AVC ¶¶ 31, 35, 40.[9]

Because RSA 659:35(I) cannot survive any form of constitutional scrutiny—let alone strict scrutiny—the law violates the First and Fourteenth Amendments to the United States Constitution.[10]

> **B.     RSA 659:35(I) Is Substantially Overbroad And, Therefore, Is Facially Unconstitutional Under The First Amendment.**

RSA 659:35(I) is also substantially overbroad. A statute is overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (internal quotation marks and citations omitted). The Court's inquiry is not limited to the application of the challenged provisions to the particular plaintiffs before it, as "[l]itigants … are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from

---

[9] RSA 659:35(I) also cannot possibly serve the purpose of protecting the victims of voter coercion. For example, if the State is concerned about a voter being coerced to vote in a certain way by a spouse, employer, or union representative, this statute actually penalizes the victimized voter who is alleged to have displayed his or her ballot to the coercing party.

[10] The State may argue that RSA 659:35(I) is constitutional on the grounds that it provides alternative channels of communication by allowing voters to verbally or in writing disclose for whom they voted. Setting aside the fact that this argument ignores the powerful imagery of a marked ballot, this argument is irrelevant because RSA 659:35(I) regulates speech on the basis of its content, and therefore a "time, place, and manner" analysis is inapplicable. *See Reno v. ACLU*, 521 U.S. 844, 880 (1997). But even if this argument was relevant, it would still fail. As the United States Supreme Court has explained:

> [Such a position] is equivalent to arguing that a statute could ban leaflets on certain subjects as long as individuals are free to publish books. In invalidating a number of laws that banned leafletting on the streets regardless of their content—we explained that "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place."

*Id.* (quoting *Schneider v. State*, 308 U.S. 147, 163 (1939)).

constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973).[11]

Here, RSA 659:35(I) is, on its face, overly broad because it restricts a substantial volume of constitutionally-protected political speech. Where the prior version of RSA 659:35(I) was limited to banning the display of a marked ballot in a polling place prior to the ballot being cast on election day, RSA 659:35(I) now prohibits this same form of speech (i) far beyond the polling place, (ii) indefinitely after the date of the election, and (iii) without any nexus to vote corruption. For example, the political speech that is swept within the scope of RSA 659:35(I) now includes the following:

    a.    The publication on Facebook of a photograph of a marked ballot by an 18-year-old, newly-minted voter—or anyone else for that matter—who is excited about voting in her first presidential election and wishes to publicly show her enthusiastic support for a candidate using the powerful imagery of the very document she used to participate in the democratic process for the first time;

    b.    The publication on Facebook by Plaintiff Andrew Langlois of a photograph of his marked ballot reflecting that he wrote in the name of his recently-deceased dog "Akira" as his Republican selection for the U.S. Senate to protest against the Senate candidates listed on the Republican ballot;

    c.    The publication on social media by Plaintiff political candidates Leon H. Rideout and Brandon D. Ross of photographs of their marked ballots reflecting that they voted for themselves to demonstrate a sense of pride and enthusiasm in their candidacy;

    d.    The publication on social media by Plaintiffs Leon H. Rideout and Brandon D. Ross of their marked ballots reflecting their political protest against RSA 659:35(I) for its violation of fundamental free speech rights; and

    e.    In the privacy of their own home, a husband's display of a photograph of his marked ballot to his wife days (or even months or years) after the election to show his pride for having supported certain candidates.

---

[11] The Court need not reach Plaintiffs' overbreadth challenge because it is apparent that RSA 659:35(I) is not narrowly tailored. *See McCullen*, 134 S. Ct. 2518, 2540 n.9 (addressing tailoring first, and concluding that, since the law was not narrowly tailored, "we need not consider … petitioners' overbreadth challenge"). The Court need only reach the question of overbreadth if it determines that the law is narrowly tailored.

This speech is plainly protected under the First Amendment, and its regulation in no way effectuates the purpose of the law. *See McIntyre*, 514 U.S. at 346 ("[T]here is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs.").

In light of these examples of innocent, political speech that are now banned, RSA 659:35(I)'s overbreadth—and thus facial unconstitutionality—is apparent. As the United States Supreme Court has explained, "[t]he Government may not suppress lawful speech as the means to suppress unlawful speech. Protected speech does not become unprotected merely because it resembles the latter. The Constitution requires the reverse." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002) (Child Pornography Prevention Act of 1996's ban on virtual child pornography was unconstitutionally overbroad because it proscribed speech which was neither child pornography nor obscene). Moreover, "[t]he possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted …." *Broadrick*, 413 U.S. at 612. This is precisely why the overbreadth doctrine exists—to "prohibit[] the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft*, 535 U.S. at 255.[12]

Finally, RSA 659:35(I) fails to realize the critical importance of online political speech under the First Amendment as well as to American culture. For many people throughout New Hampshire—indeed, the United States—the Internet has become the predominant means for communication and public discourse. "Through the use of chat rooms, any person with a phone line can become a town crier with a voice that resonates farther than it could from any soapbox. Through the use of web pages, mail exploders, and newsgroups, the same individual can become a

---

[12] *See also Reno*, 521 U.S. at 880 (Communications Decency Act of 1996 was overbroad because it "suppress[ed] a large amount of speech that adults have a constitutional right to send and receive"); *Stevens*, 559 U.S. at 475 (federal criminal statute's ban on "depictions of animal cruelty" was overbroad because "[a] depiction of entirely lawful conduct runs afoul of the ban").

pamphleteer." *Reno*, 521 U.S. at 870; *see also Clement v. Cal. Dep't of Corrs.*, 364 F.3d 1148, 1152 (9th Cir. 2004) (The First Amendment "protects material disseminated over the internet as well as by the means of communication devices used prior to the high-tech era"). Now, more than ever, "[t]he content on the Internet is as diverse as human thought." *Reno*, 521 U.S. at 870 (internal quotation marks and citation omitted). The ideas, opinions, emotions, actions, and desires capable of communication through the Internet are limited only by the human capacity for expression. If First Amendment protections are to enjoy enduring relevance in the twenty-first century, they must apply with full force to speech conducted online and through social media platforms.

Because a substantial number of RSA 659:35(I)'s applications are unconstitutional, the law must be enjoined.

## II.     Plaintiffs Have Been And Will Be Irreparably Harmed By The Law.

Plaintiffs and members of the public will be irreparably harmed in the absence of a preliminary injunction, especially where the State has stated publicly that it will continue to enforce the law. AVC ¶¶ 4-5, 33-34, 37-38; Biss. Aff. ¶ 2, *Exhibit A*. Any loss of constitutional rights is presumed to be an irreparable injury. *Colon-Marrero v. Conty Perez*, 698 F.3d 46, 47 (1st Cir. 2012) (*quoting Elrod v. Burns*, 427 U.S. 347, 373 (1976)). If the State is permitted to continue enforcing the law, Plaintiffs and others will be prohibited from exercising their First Amendment free speech rights to engage in political speech on matters of public importance that is wholly unrelated to the purported interests behind the law. Thus, Plaintiffs and members of the public will be irreparably harmed by the loss of their First Amendment rights if a preliminary injunction is not granted.

## III.     The Balance Of Equities Favors Plaintiffs.

Plaintiffs' hardships if the injunction is not granted outweigh the State's interests if the

injunction is granted.  As explained in Plaintiffs' Amended Verified Complaint, "Plaintiffs wish to continue engaging in this form of political speech that is prohibited by the plain language of RSA 659:35(I).  However, in light of the law's terms and the Attorney General's enforcement efforts, Plaintiffs reasonably believe that they will be investigated and prosecuted if they continue to do so.  Absent relief from this Court, Plaintiffs will be required to self-censor their expression or face punishment by the State.  Thus, the law is imposing and will continue to impose irreparable harm upon Plaintiffs' free speech activities unless it is enjoined."  AVC ¶ 42.  In contrast, the State will not suffer any hardship if the injunction is granted, especially where it still has the ability to investigate and prosecute vote bribery and voter coercion under RSA 659:40(I-II).  Thus, the balance of hardships weighs in favor of Plaintiffs.

## IV.    The Public Interest Is Served By The Granting Of A Preliminary Injunction.

The granting of a preliminary injunction will benefit the public interest.  It is in the public's interest to protect constitutional rights.  *See Hyde Park Partners, L.P. v. Connolly*, 839 F.2d 837, 854 (1st Cir. 1988) ("obviously, should the statute be unconstitutional, the public interest would be adversely affected by denial of [] an injunction"). Granting a preliminary injunction in favor of Plaintiffs would protect sacred freedom of speech principles.  Thus, the public interest is best served by the granting of the injunction.

## CONCLUSION

For the foregoing reasons, the Plaintiffs have made the showing entitling them to preliminary injunctive relief.  Accordingly, Plaintiffs respectfully request that the Court grant their motion for a preliminary injunction and enjoin enforcement of RSA 659:35(I).

Respectfully submitted,

LEON H. RIDEOUT, ANDREW LANGLOIS, and
BRANDON D. ROSS,

By and through their attorneys affiliated with the New
Hampshire Civil Liberties Union Foundation,


*/s/ Gilles R. Bissonnette*
Gilles R. Bissonnette (N.H. Bar. No. 265393)
NEW HAMPSHIRE CIVIL LIBERTIES UNION
18 Low Avenue
Concord, NH  03301
Tel.:  603.224.5591
Gilles@nhclu.org

William E. Christie (N.H. Bar. No. 11255)
SHAHEEN & GORDON, P.A.
107 Storrs Street
P.O. Box 2703
Concord, NH  03302
Tel.:  603.225.7262
wchristie@shaheengordon.com


Dated:    November 12, 2014

## CERTIFICATE OF SERVICE

I, Gilles Bissonnette, hereby certify that a copy of the foregoing document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF). On the date of this filing, a copy of this document has also been sent by email to the following:

Richard Head (Richard.Head@doj.nh.gov)
Stephen G. LaBonte (Stephen.LaBonte@doj.nh.gov)
New Hampshire Department of Justice
33 Capitol Street
Concord, NH 03301

*/s/ Gilles Bissonnette*
Gilles Bissonnette