## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

———————————————————————

|  |  |  |
|---|---|---|
| LEON H. RIDEOUT, | ) | |
| ANDREW LANGLOIS, and | ) | |
| BRANDON D. ROSS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Case. No. 1:14-cv-00489-PB |
| | ) | |
| WILLIAM M. GARDNER, Secretary of | ) | |
| State of the State of New Hampshire, in his | ) | |
| official capacity, | ) | |
| | ) | |
| Defendant | ) | |

———————————————————————

### PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Now come Plaintiffs Leon H. Rideout, Andrew Langlois, and Brandon Ross and respectfully offer this Memorandum of Law in Support of Their Motion for Summary Judgment seeking a declaration that RSA 659:35(I) violates the First Amendment and a permanent injunction enjoining its enforcement.

### INTRODUCTION AND SUMMARY OF ARGUMENT

This case proves the truth of the old adage that "a picture is worth a thousand words."  In furtherance of this important principle, which is embedded in the First Amendment, Plaintiffs ask the Court to permanently enjoin the State's enforcement of RSA 659:35(I) on the grounds that it violates free speech rights.  RSA 659:35(I), which became effective on September 1, 2014, bans a person from displaying a photograph of a marked ballot reflecting "how he or she has voted," including on the Internet through social media platforms like Twitter, Facebook, and Instagram.  The law contains no exceptions.  Now, willfully engaging in this form of innocent, political

speech is a violation-level offense punishable by a fine of up to $1,000.

RSA 659:35(I) encroaches upon the First Amendment by banning voluntary political speech on matters of public concern occurring outside the polling place (including in one's home) that is unrelated to the State's purported interest in enacting the law: to address vote buying and voter coercion.[1]  As explained below, the law is facially unconstitutional for two separate and independent reasons.  _First_, RSA 659:35(I) is a content-based restriction on political speech, as the law prohibits the revelation of specific content—namely, a marked ballot demonstrating how a person "has voted."  Thus, this law must be narrowly tailored to serve a compelling governmental interest.  In discovery, the State has not identified a single tangible instance of vote buying or voter coercion since the late 1800s.  The State has even acknowledged that it has never received a complaint or concern regarding a voter displaying or publishing a photograph of his or her marked ballot to a party buying or coercing a vote since 1976.  And even if addressing vote corruption is a compelling governmental interest, the challenged law cannot possibly be viewed as a narrowly-tailored means to address this interest because the law bans innocent, political speech wholly unrelated to corruption.  Prior to proposing this law, the Secretary of State's Office conducted no studies, investigation, or inquiry into whether there were more narrowly-tailored means of addressing vote buying or voter coercion without also suppressing innocent political speech.  Indeed, both the Secretary of State and Deputy Secretary of State testified at deposition that pure political speech unrelated to vote buying or voter coercion is intentionally banned by the statute.  As an example from the Secretary of State's deposition:

> Q.  And your answer about my grandmother should be prosecuted for a violation-level offense for publishing her ballot because she wants people to know who she voted for is the same even in instances where there's no allegation of vote bribery relating to her

---

[1] In using the term "voter coercion" throughout this memorandum, Plaintiffs intend to mean the form of conduct that is prohibited under RSA 659:40(II)—namely conduct where one "threaten[s] force, violence, or any tactic of coercion or intimidation to knowingly induce or compel any other person to vote or refrain from voting, vote or refrain from voting for any particular candidate or ballot measure, or refrain from registering to vote."

conduct?
A. Yes.
Q. And even—your answer is the same even when there's no allegation of coercion involved in her conduct?
A. Yes.

Affidavit of Gilles Bissonnette (hereinafter, "Biss. Aff.") ¶ 2, *Ex. A* (Gardner Depo. 61:3-13).

They also testified that the statute punishes potential victims of vote buying and voter coercion, and that other laws currently in effect—RSA 659:40(I-II) in particular—already make vote buying and voter coercion a criminal offense.  Given this record, it cannot possibly be said that the State has satisfied its significant burden of demonstrating that RSA 659:35(I) is constitutional.  *See McCullen v. Coakley*, 134 S. Ct. 2518, 2539-40 (2014) ("To meet the requirement of narrow tailoring, *the government must demonstrate* [that the speech restriction meets the relevant requirements]; striking down law where the State "*has not shown that it seriously undertook to address the problem with less intrusive tools readily available to it*.") (emphasis added).  Here, the more tailored approach is obvious: to investigate and prosecute vote-buying transactions and incidents of voter coercion—conduct which is already illegal.  The First Amendment does not allow the State to, as it is doing here, broadly ban innocent, political speech with the hope that such a sweeping ban will address underlying criminal conduct.

   *Second*, for the same reasons, RSA 659:35(I) is substantially overbroad and therefore facially unconstitutional.  A statute is facially overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (internal quotation marks and citations omitted).  What the law ignores is that displaying a photograph of a marked ballot on the Internet is a powerful form of political speech that conveys various constitutionally-protected messages that have no relationship to vote buying or voter coercion.  In fact, RSA 659:35(I) is unprecedented.  New Hampshire is the only state in the country to update its decades-old election

3

laws during the social media age with the specific intent to ban this form of online political speech occurring outside the polling place.[2]   Now, an 18-year-old, newly-minted voter who is excited about voting in her first presidential election and wishes to publicly show on Facebook her enthusiastic support for a candidate using the powerful imagery of the very document she used to participate in the democratic process is prohibited from doing so.   Similarly, a new American citizen who is excited about voting in his first American election after emigrating from Iraq is barred from engaging in this form of speech.   Because RSA 659:35(I) sweeps within its scope huge amounts of protected political speech, it is unconstitutional on its face.

The New Hampshire Attorney General's Office is and will continue enforcing RSA 659:35(I) regardless of whether the speech bears any nexus to vote bribery or voter coercion.   As the Attorney General's Office told the *Concord Monitor* in an article published on November 7, 2014, "We're still enforcing the law as it is currently written."   *See* Biss. Aff. ¶ 7, *Ex. F* (Nov. 7, 2014 *Concord Monitor* Article) (reporting that "[d]ozens of ['ballot selfie'] photos popped up on social media Tuesday").   The State is currently investigating four individuals for alleged violations of RSA 659:35(I), which includes the three Plaintiffs.   The State does not dispute that Plaintiffs' respective postings of their marked ballots online were unrelated to vote bribery or voter coercion. For example, days after this lawsuit was filed, the State threatened prosecution of Plaintiff Leon H. Rideout—who is a member of the House of Representatives and a 26-year marine veteran with service in both Operation Desert Shield/Desert Storm and Fallujah during the Iraq war—for posting his marked ballot on social media during the September 9, 2014 primary election.   The

---

[2] *See* Biss. Aff. ¶ 6, *Ex. E* (50-State Survey).   In 2011 and 2014, Maine and Oregon, respectively, repealed laws banning the display of a marked ballot.   *See* 21-A M.R.S. § 674(1)(D) (repealed section that prohibited the showing of a "marked ballot to another with the intent to reveal how that person voted"); 2014 Oregon Senate Bill 1504, https://olis.leg.state.or.us/liz/2014R1/Downloads/MeasureDocument/SB1504/Enrolled (effective January 1, 2015, repealing language in Or. Rev. Stat. § 260.695(7) stating that "[a] person may not show the person's own marked ballot to another person to reveal how it was marked").   Currently, the legislatures of Arizona, Hawaii, and Illinois are also considering bills that would directly allow the online display of photographs depicting marked ballots.

State was prepared to serve Representative Rideout with a complaint for violating the statute, but he was spared immediate prosecution following an agreement to toll the statute of limitations for the duration of this lawsuit.  In addition, the Attorney General's Office is investigating Plaintiff Andrew Langlois under the law for speech he engaged in during the September 2014 primary election.  On Mr. Langlois' marked ballot that he later published on Facebook, he wrote the name of his recently-deceased dog "Akira" as his Republican choice for U.S. Senate.  Mr. Langlois' vote and the publication of his ballot on Facebook were acts of protest against his choices for Senate—each of whom he disapproved.  And finally, Plaintiff Brandon Ross—a Republican and House candidate during the 2014 primary and general election—is being investigated for posting his marked primary ballot online after Democrat Timothy Horrigan, the sponsor of HB 366, filed a complaint with the Attorney General's Office against him.

Simply put, RSA 659:35(I) threatens irreparable harm to Plaintiffs' free speech rights, as it will inhibit innocent, political speech far beyond the vote corruption conduct that the law aims to address.  Even worse, Plaintiffs may be prosecuted.  As the First Circuit recently noted, "First Amendment rights are fragile, and it is not only the occasional abuse of censorship power but also the threat inherent in the existence of that power that may chill protected expression."  *Van Wagner Boston, LLC v. Davey*, 770 F.3d 33, 34 (1st Cir. 2014).  Accordingly, Plaintiffs respectfully request that the Court enter judgment in their favor, declare RSA 659:35(I) violative of the First Amendment, and enter an immediate permanent injunction barring its enforcement.

## FACTS

## I.      HB 366 And The Purported Governmental Interests Behind It.

Effective September 1, 2014, RSA 659:35(I) was modified to state the following: "No voter shall allow his ***or her*** ballot to be seen by any person with the intention of letting it be known how he ***or she*** is about to vote ***or how he or she has voted*** except as provided in RSA

659:20.[3] ___**This prohibition shall include taking a digital image or photograph of his or her**___ ___**marked ballot and distributing or sharing the image via social media or by any other means**___." (bolded, italicized, and underlined language reflect the modifications that became effective on September 1, 2014) (hereinafter, "HB 366").  A willful violation of this statute is a violation-level offense.  RSA 659:35(IV).   Violations are punishable by a fine not to exceed $1,000.   RSA 651:2(IV)(a).

Under the prior version of RSA 659:35(I), it was unlawful to display one's marked ballot reflecting how one was "about to vote."  As a result, the law effectively only burdened speech on election day inside the polling place between the moment a voter marked the ballot and the moment the voter placed the ballot in the ballot box.  The law dates back to the early 1890s, and was codified as RSA 659:35(I) in 1979.

HB 366 originated with the Secretary of State's Office, which drafted its initial language and secured the sponsorship of Democratic Representative Timothy Horrigan.  Biss. Aff. ¶ 4, _Ex._ _C_ (Scanlan Depo. 10:14-17; 13:2-22; 29:10-14).  The governmental interest behind HB 366 was to address vote buying and voter coercion.  _See, e.g.,_ Biss. Aff. ¶ 8, _Ex. G_ (HB 366 Legislative History at 113-118, Nov. 20, 2013 House Election Law Committee Report).  According to Deputy Secretary of State David M. Scanlan's April 9, 2014 testimony before the Senate Public and Municipal Affairs Committee, HB 366 was necessary to update the law in light of modern technology to address vote buying, which he argued was "rampant" in the late 1800s.[4]  He

---

[3] RSA 659:20, entitled "Assistance in Voting," states the following: "Any voter who declares to the moderator under oath that said voter needs assistance marking his or her ballot shall, upon the voter's choice and request after the moderator has informed the voter of the accessible voting options that are available at the polling place, receive the assistance of one or both of the inspectors of election detailed for that purpose by the moderator or of a person of the voter's choice provided that the person is not the voter's employer or union official.  Such person so assisting shall be sworn, shall mark the ballot as directed by said voter, and shall thereafter give no information regarding the same. Such person so assisting shall leave the space within the guardrail with the voter."

[4] According to Secretary of State William Gardner, the law was necessary to stop the establishment of oppressive voting practices that existed under Adolf Hitler in the 1930s, Joseph Stalin in Soviet-occupied Poland, and Saddam

expressed fear that "we have this great new technology now that allows people to go in the polling place, to take an image of their ballot before they put it in the ballot box, and then distribute it instantly to whomever and wherever they want to distribute it. [This] creates a new opportunity to go back to the days prior to the 1890s when votes could be bought and purchased." Biss. Aff. ¶ 9, *Ex. H* (Recording of Apr. 9, 2014 Senate Public and Municipal Affairs Hearing) (13:35; 15:34). Deputy Secretary Scanlan did not cite a single incident of vote buying in New Hampshire since the late 1800s, let alone a vote buying transaction that was consummated by the display of a marked ballot on the Internet.[5] *See also* Biss. Aff. ¶ 3, *Ex. B* (Apr. 9, 2014 Senate Public and Municipal Affairs Hearing Report, Gardner Ex. 3); Biss. Aff. ¶ 8, *Ex. G* (HB 366 Legislative History at 58-65).

Similarly, in April 9, 2014 testimony by the bill's sponsor before the Senate Public and Municipal Affairs Committee, Representative Timothy Horrigan stated that HB 366 was designed, in part, to address a "scheme [where] somebody is trying to buy votes and they … make you take a picture of their ballot on their cell phone and go out and show it to a guy and he hands you a $5 or $10 bill." *Id.* (5:17). Representative Horrigan further testified that he did not know if anyone had "done such a scheme," but that it was worth making it illegal anyway. *Id.* (5:30); *see also* Biss. Aff. ¶ 10, *Ex. I* (Representative Timothy Horrigan's Website Addressing HB 366). Representative Mary Till, a member of the House Election Law Committee, also testified in favor of HB 366 before the Senate Public and Municipal Affairs Committee on April 9, 2014. She argued that the law would help ensure that "no one is coerced to vote in a particular way." She

---

Hussein in Iraq prior to 2003. Biss. Aff. ¶ 2, *Ex. A* (Gardner Depo. 18:13-25:14). Throughout his deposition, Secretary Gardner referenced the looming threat of Hitler, Stalin, or Hussein as a justification for the law.

[5] Deputy Secretary Scanlan echoed these same sentiments to the *New Hampshire Union Leader* following the September 9, 2014 primary election: "In the 1880s, [vote buying] was a real problem …. It was easy to see how someone voted and it was not unusual to pay as much as $10 a vote …. With digital technology, that door was opening again … where you could take a selfie of your ballot and post it on Facebook showing how you voted." Biss. Aff. ¶ 11, *Ex. J* (Sept. 20, 2014 *New Hampshire Union Leader* Article).

expressed concern that "someone with authority over the voter—for example, an employer, a union [representative], or a spouse—could coerce the voter into providing a photo of his or her completed ballot to prove that they voted the way they were told to vote."  Biss. Aff. ¶ 9, _Ex. H_ (Recording of Apr. 9, 2014 Senate Public and Municipal Affairs Hearing) (8:14).

**II.     The State Has Proffered No Evidence Of Vote Buying Or Voter Coercion In New Hampshire Since The Late 1800s.**

The State has presented no evidence indicating that vote bribery or voter coercion has occurred in New Hampshire since the late 1800s, let alone shown that a photograph of a marked ballot has ever been displayed online in New Hampshire as part of a vote corruption scheme. Biss. Aff. ¶ 12, _Ex. K_ (Sept. 22, 2014 Right-to-Know Request to Attorney General's Office and Response); Biss. Aff. ¶ 13, _Ex. L_ (Sept. 22, 2014 Right-to-Know Request to Secretary of State's Office and Response).  Indeed, the Secretary of State's Office has admitted that it has not received a complaint or concern regarding a voter displaying or publishing a photograph of his or her marked ballot to a party buying or coercing the vote in New Hampshire from 1976 to the present, nor does that Office recall any specific incidents of vote buying or voter coercion from 1976 to the present.[6]  Biss. Aff. ¶¶ 3, 5, _Exs. B and D_ (State's Int. Resp. Nos. 18, 20; Gardner Ex. 1; Scanlan Ex. 2); Biss. Aff. ¶ 4, _Ex. C_ (Scanlan Depo. 23:11-22; 47:13-48:10).

**III.    The Plaintiffs, And The State's Enforcement Of RSA 659:35(I) After September 1, 2014.**

Since HB 366 became effective on September 1, 2014, the New Hampshire Attorney General's Office has enforced RSA 659:35(I) and has been actively investigating individuals who posted their marked ballots on the Internet, regardless of whether this speech is related to the

---

[6] Secretary Gardner referenced one instance where individuals speaking a foreign language were permitted to vote and speculated that these voters could have been coerced because a foreign language was used in the polling place. However, Secretary Gardner could not testify that voter coercion, or vote bribery for that matter, actually occurred in this instance.  Biss. Aff. ¶ 2, _Ex. A_ (Gardner Depo. 41:13-46:14).

State's asserted interests in passing the law.  The State is currently investigating four individuals for alleged violations of RSA 659:35(I), which includes the three Plaintiffs.  Biss. Aff. ¶ 14, *Ex. M* (2015 HB 404 fiscal note stating that the Department of Justice "currently has four such pending complaints").

A.   **Plaintiff Representative Leon H. Rideout**

Plaintiff Leon H. Rideout is a member of the House of Representatives representing District 7 in Coos County.  He is a 26-year veteran of the U.S. Marine Corps. who served in both Operation Desert Shield/Desert Storm and the Iraq War.  He is also a member of the Lancaster Board of Selectmen.  *See* Biss. Aff. ¶ 15, *Ex. N* (Rideout Linkedin Profile).  He voted during the September 9, 2014 Republican primary election in Lancaster where he was on the ballot.  During the primary election, he took a photograph of his marked ballot with his phone prior to casting the ballot.  The marked ballot reflected that he voted for himself as well as other Republican candidates.  Hours after the ballot was cast, Representative Rideout posted the photograph on Twitter, along with the text "#COOS7 vote in primary 2014#nhpolitics."  Amended Verified Complaint ("AVC") ¶¶ 31-32 (Doc. No. 5); *see also* Biss. Aff. ¶¶ 3, 5, *Exs. B and D* (Rideout Twitter Posting, Scanlan Ex. 3, Gardner Ex. 4).  He also posted the photograph to his House of Representatives Facebook page, which "is intended to keep the resident[s] of COOS 7 informed of any and all [l]aws happening on the state level that could [affect] their lives."  Biss. Aff. ¶ 5, *Ex. D* (Facebook Page in Rideout Investigatory File of Attorney General's Office, Scanlan Ex. 4); *see also* Biss. Aff. ¶ 16, *Ex. O* (complete Attorney General Rideout File); Biss. Aff. ¶ 17, *Ex. P* (Admission Response Nos. 7-9).

In a September 11, 2014 *Nashua Telegraph* article, Representative Rideout explained: "I did it to make a statement …. I had promised a few other [representatives] that I would post my ballot, and I did …. I think [RSA 659:35(I) is] unconstitutional …. It's really just an overreach of

the government trying to control something that, in my opinion, doesn't need to be regulated." Biss. Aff. ¶ 18, *Ex. Q* (Sept. 11, 2014 *Nashua Telegraph* Article).  It is not disputed that Representative Rideout's posting had nothing to do with vote corruption.  AVC ¶ 32.

The same day this *Nashua Telegraph* article was published on September 11, 2014, the Secretary of State's Office sent an email to the Attorney General's Office linking the article and Representative Rideout's Facebook page containing the ballot photograph.  The Attorney General's Office then initiated an investigation of Representative Rideout for violating RSA 659:35(I).  Biss. Aff. ¶ 5, *Ex. D* (Partial Rideout Attorney General File, Scanlan Ex. 4); *see also* Biss. Aff. ¶ 16, *Ex. O* (complete Attorney General Rideout File); Biss. Aff. ¶ 17, *Ex. P* (Admission Response Nos. 7-9); Biss. Aff. ¶ 4, *Ex. C* (Scanlan Depo. 51:12-15).  Paul Brodeur, an investigator from the Attorney General's Office, called Representative Rideout and requested an interview, which was conducted on September 16, 2014.  During the interview, which was recorded, Representative Rideout admitted that he published a photograph of his marked ballot.  He explained his position as follows to Mr. Brodeur:

> I don't agree with the premise .... I just think it's a free speech thing.  If somebody wants to show their ballot they should be able to show their ballot.  I do think there's a constitutional question ... on the law.  I spoke out against it when it [came] to the floor of the House.  *And one of the things that I have attempted to do since I've been a State Rep is keep my constituents informed of different things going on within the State*.  And I can tell you so far the response has been as the word has got out is a lot of support and a lot of shock that this law even exists on the books.  And it was just to make people aware.  Most of I'd say probably better than 90-99 percent of the people in the State of New Hampshire are not aware of this RSA.

Biss. Aff. ¶ 16, *Ex. O* (complete Attorney General Rideout File) (emphasis added); Biss. Aff. ¶ 19, *Ex. R* (Rideout Interview Recording) (5:10); *see also* Biss. Aff. ¶ 20, *Ex. S* (Sept. 19, 2014 *Nashua Telegraph* Article); AVC ¶¶ 32-33.  Representative Rideout also informed Mr. Brodeur that the poster posted at the polls supposedly informing voters of RSA 659:35(I) was "ineffective" and not a sufficient means of providing notification.  Biss. Aff. ¶ 16, *Ex. O* (complete Attorney General

Rideout File); Biss. Aff. ¶ 19, _Ex. R_ (Rideout Interview Recording) (6:11).

Days after the filing of this lawsuit, the Attorney General's Office threatened Representative Rideout with prosecution under RSA 659:35(I) and prepared a complaint to be served in light of the 3-month statute of limitations period.  Biss. Aff. ¶ 16, _Ex. O_ (complete Attorney General Rideout File); _see also_ RSA 625:8(I)(d).  No complaint was ultimately served after Plaintiffs entered into agreements with the State to toll the statute of limitations period.

### B.    Plaintiff Andrew Langlois

The Attorney General's Office is also investigating Plaintiff Andrew Langlois for violating RSA 659:35(I).  Mr. Langlois voted during the September 9, 2014 Republican primary election in Berlin.  Because Mr. Langlois did not approve of his Republican choices for U.S. Senate, Mr. Langlois wrote the name "Akira" as a write-in candidate.  "Akira" is the name of Mr. Langlois' dog that passed away just days before the primary election.  Prior to casting the marked ballot, Mr. Langlois took a photograph of the ballot's U.S. Senate section with his phone while in the ballot booth.  He then went home and posted the photograph on Facebook, along with commentary reflecting his frustration with his Republican choices for U.S. Senate.  AVC ¶¶ 35-36.  The commentary stated, in part: "Because all of the candidates SUCK, I did a write-in of Akira (my now decease …."  Biss. Aff. ¶¶ 21, 23, _Ex. T and U_ (Langlois Photo and Posting); Biss. Aff. ¶ 3, _Ex. B_ (Langlois Photo and Posting; Gardner Ex. 5).  In short, Mr. Langlois' posting was a protest against his choices for public office—a political message that would have been far less salient without the photograph indicating that his deceased dog "Akira" was his candidate of choice.  AVC ¶¶ 35-36.  It is not disputed that Mr. Langlois' posting had nothing to do with vote corruption.  _Id._ ¶ 36.

After the primary election, Mr. Langlois received a phone call from investigator Paul Brodeur.  Mr. Brodeur explained that Mr. Langlois was being investigated for posting his ballot on

social media in violation of RSA 659:35(I).  At first, Mr. Langlois could not believe that what he did was illegal.  He told Mr. Brodeur that the phone call must be some sort of "joke."  Mr. Langlois expressed surprise that the State would be investigating someone for posting a photograph of a ballot indicating that a voter had voted for his dog. *Id.* ¶ 37.

Following the submission of a Right-to-Know records request to the Attorney General's Office by the American Civil Liberties Union of New Hampshire, the Attorney General's Office confirmed in late October 2014 that Mr. Langlois is still being investigated for violating RSA 659:35(I) and that his file is "open."  Biss. Aff. ¶ 26; Biss. Aff. ¶ 17, *Ex. P* (Admission Response Nos. 12-13).

### C.    Plaintiff Brandon D. Ross

Plaintiff Brandon D. Ross voted during the September 9, 2014 Republican primary election in Manchester.  Mr. Ross was a candidate on the ballot at the time, as he was running to be one of two Republican nominees to represent Hillsborough County District 42's two seats in the New Hampshire House of Representatives (which represents Wards 1 through 3 in Manchester).  After Mr. Ross marked his ballot with his choices and prior to the ballot being cast, he took a photograph of the ballot with his phone.  His marked ballot reflected that he was voting for himself, as well as other Republican candidates.  Mr. Ross took this picture to keep a record of his vote, to assist him in the future with remembering other candidates for whom he voted, and to preserve the opportunity to show his marked ballot to friends as a means of demonstrating his support for certain political candidates.  Mr. Ross was aware of RSA 659:35(I) when he took this photograph, but—demonstrating the chilling effect of the law—he did not immediately publish the photograph because of the law's penalties.  AVC ¶ 39.

Over one week later, Mr. Ross became aware that the New Hampshire Attorney General's Office was investigating voters for violating RSA 659:35(I).  In response, on September 19, 2014,

Mr. Ross posted the photograph of his marked ballot on Facebook with the text "Come at me bro." Biss. Aff. ¶¶ 23-24, *Ex. V and W* (Ross Photo and Posting); Biss. Aff. ¶ 17, *Ex. P* (Admission Response Nos. 10-11).  The text, in part, symbolized his political objection to RSA 659:35(I) on free speech grounds and his deep concern about the Attorney General's investigations of qualified voters.  In short, the picture, combined with the text, was a form of political protest and a statement that he was willing to risk prosecution in order to stand up for his First Amendment rights.  *Id.* ¶ 40.  It is not disputed that Mr. Ross's posting had nothing to do with vote corruption. *Id.* ¶ 41.

Mr. Ross is currently being investigated by the Attorney General's Office for his posting. This investigation was triggered by an election law complaint filed by the sponsor of HB 366, Democratic Representative Timothy Horrigan, with the Attorney General's Office on October 2, 2014.  Biss. Aff. ¶ 24, *Ex. W* (Partial Attorney General Ross File) (Rep. Horrigan alleging a "violation of RSA 659:35 by Atty. Brandon Ross").

## STANDARD

Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The evidence submitted in support of the motion must be considered in the light most favorable to the nonmoving party, drawing all reasonable inferences in its favor.  *See Navarro v. Pfizer Corp.*, 261 F.3d 90, 94 (1st Cir. 2001).  A party seeking summary judgment must first identify the absence of any genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A material fact "is one 'that might affect the outcome of the suit under the governing law.'"  *United States v. One Parcel of Real Prop. with Bldgs.*, 960 F.2d 200, 204 (1st Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Here, there are no material facts in dispute.  Thus, the question of whether a permanent injunction should be

issued is ripe for summary judgment.

In determining whether to grant a permanent injunction, the Court must find that: "(1) plaintiffs prevail on the merits; (2) plaintiffs would suffer irreparable injury in the absence of injunctive relief; (3) the harm to plaintiffs would outweigh the harm the defendant would suffer from the imposition of an injunction; and (4) the public interest would not be adversely affected by an injunction." *Healey v. Spencer*, 765 F.3d 65, 74 (1st Cir. 2014) (quoting *Asociacion de Educacion Privada de P.R., Inc. v. Garcia-Padilla*, 490 F.3d 1, 8 (1st Cir. 2007)). The first factor—success on the merits—predominates in this determination. *See Sindicato Puertorriqueno de Trabajadores v. Fortuno* 699 F.3d 1, 10 (1st Cir. 2012) ("In the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis."). Each criteria is satisfied here, and a permanent injunction should be issued.

## ANALYSIS

## I.      Plaintiffs Prevail On The Merits.

The U.S. Supreme Court "has characterized the freedom of speech and that of the press as fundamental personal rights and liberties. The phrase is not an empty one and [is] not lightly used." *Schneider v. New Jersey*, 308 U.S. 147, 161 (1939) (footnote omitted). "It has become axiomatic that '[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms.'" *United States v. Robel*, 389 U.S. 258, 265 (1967) (quoting *NAACP v. Button*, 371 U.S. 415, 438 (1963)).

At the outset, it should go without saying that RSA 659:35(I), in banning the online display of a photograph of a marked ballot, regulates speech. *See, e.g.*, *United States v. Stevens*, 559 U.S. 460, 468 (2010) (First Amendment applies to "visual [and] auditory depiction[s]"). And the challenged law regulates not just any speech, but political speech. *See, e.g., Matthews v. Town of Needham*, 764 F.2d 58, 60 (1st Cir. 1985) ("political speech" is "generally accorded great

protection"); *see also Members of the City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 816 (1984) ("political speech is entitled to the fullest possible measure of constitutional protection"); *Buckley v. Valeo*, 424 U.S. 1, 48 (1976) ("advocacy of the election or defeat of candidates for federal office is no less entitled to protection under the First Amendment than the discussion of political policy generally or advocacy of the passage or defeat of legislation").[7]  RSA 659:35(I) facially violates the First Amendment and should be enjoined for the two independent reasons explained below.

### A.   RSA 659:35(I) Fails Strict Scrutiny And, Therefore, Is Facially Unconstitutional Under The First Amendment.

Content-based restrictions are presumptively invalid,[8] *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992), and are permitted only if they are narrowly tailored to promote a compelling governmental interest.  *See Vono v. Lewis*, 594 F. Supp. 2d 189, 204 (D.R.I. 2009).  The same is true of restrictions on political speech.  *Citizens United v. FEC*, 558 U.S. 310, 340 (2010) ("Laws that burden political speech are subject to strict scrutiny ….") (internal quotations omitted).  The burden to satisfy this standard falls squarely on the State.  *See McCullen v. Coakley*, 134 S. Ct. 2518, 2537-40 (2014); *United States v. Playboy Ent. Group, Inc.*, 529 U.S. 803, 816-17 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions.") (collecting cases).  The State has failed to sustain its burden here.

---

[7] The State has argued that HB 366 does not implicate speech at all.  For example, in responses to interrogatory requests, the State has incorrectly contended that "HB 366 does not prohibit speech that is political in nature" because voters can express for whom they voted through other means.  Biss. Aff. ¶¶ 3, 5, *Exs. B and D* (State's Int. Resp. No. 6; Gardner Ex. 1; Scanlan Ex. 2); Biss. Aff. ¶ 4, *Ex. C* (Scanlan Depo. 32:3-22).  This argument is nonsensical. Whether or not a law allows for alternative channels of communication is wholly unrelated to whether the law actually bans speech.  A law can still ban speech while also allowing alternative channels open for communication.  The challenged law bans speech here even if the law allows other ways for a person to communicate how he or she voted.
[8] Plaintiffs do not contend that RSA:35(I), on its face, discriminates on the basis of viewpoint.

1.     **Strict Scrutiny Applies Because RSA 659:35(I) Is Content-Based.**

a.     **RSA 659:35(I) Is Content-Based Because It Requires A Government Official To Look Inside The Four Corners Of A Photograph Of A Ballot To Determine Whether A Violation Exists.**

Resting on longstanding principles, the U.S. Supreme Court in *McCullen v. Coakley*, 134 S. Ct. 2518 (2014) made clear that a law is "content based if it require[s] 'enforcement authorities' to 'examine the content of the message that is conveyed to determine whether' a violation has occurred." *Id.* at 2531 (quoting *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 383 (1984)).[9]   Indeed, in deciding whether a law creating a 35-foot buffer zone law around reproductive health care facilities was a content-based restriction on speech, the *McCullen* Court began its analysis with whether the law "draw[s] content-based distinctions *on its face*." *Id.* at 2531 (emphasis added) (citing *Boos v. Barry*, 485 U.S. 312, 315 (1988), and *Carey v. Brown*, 447 U.S. 455, 465 (1980)); *see also Stevens*, 559 U.S. at 468 (holding that 18 U.S.C. § 48 explicitly regulates expression based on content because it restricts "visual [and] auditory depiction[s]" on its face; *ACLU v Ashcroft*, 542 U.S. 656 (2004) (Child Online Protection Act designed to address "material that is harmful to minors" was content based, thereby triggering strict scrutiny); *Reno v. ACLU*, 521 U.S. 844, 879 (1997) (Communications Decency Act of 1996 criminalizing the "knowing" transmission of "obscene or indecent" messages to any recipient under 18 years of age was a content-based "blanket restriction on speech").

Thus, as explained in *McCullen*, the First Amendment does not require a plaintiff to demonstrate intentional discrimination or targeting in order to prove that the law in question is content based.  Rather, a requirement that a government official look inside the four corners of the

---

[9] *See also Forsyth County v. Nationalist Movement*, 505 U.S. 123, 135-36 (1992) (law is content based where it discriminates on the basis of the content of the message); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995) (law banning anonymous campaign literature was content based because "the category of covered documents is defined by their content—only those publications containing speech designed to influence the voters in an election").

speaker's message in order to decide how to classify the speech is enough to trigger strict scrutiny. *See, e.g., Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2663 (2011) (differential treatment of "educational communications" and "marketing" constituted content discrimination); *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 418, 420 (1993) ("categorical prohibition" on "commercial handbills" while allowing "newspapers" constituted content discrimination); *United States v. Alvarez*, 132 S. Ct. 2537, 2546-47 (2012) (categorical prohibition on "false speech" while allowing "analogous true speech" constituted content discrimination); *Burson v. Freeman*, 504 U.S. 191, 197 (1992) (law banning the display or distribution of campaign materials within 100-feet of the entrance to a polling place on election day was content based because "[w]hether individuals may exercise their free speech rights near polling places [under the law] depends entirely on whether their speech is related to a political campaign"); *see also Matthews v. Town of Needham*, 764 F.2d 58, 60 (1st Cir. 1985) (sign code found content-based where it facially banned political signs but permitted "for sale," professional office, and religious and charitable cause signs).

RSA 659:35(I) is content based because, on its face, it prohibits the revelation of specific content—namely, a marking on a ballot demonstrating how a voter "has voted." A ballot omitting this content is not subject to the law's prohibitions. Biss. Aff. ¶ 4, *Ex. C* (Scanlan Depo. 46:9-14); Biss. Aff. ¶ 2, *Ex. A* (Gardner Depo. 116:22-118:14). Whether an individual runs afoul of the law depends entirely on whether the markings on the individual's ballot indicate how a person has specifically voted. Put another way, the law is content based because it requires the government to "examine" the content of a displayed photograph of ballot to determine the message's favorability under the law. For example, a voter would not run afoul of the law by displaying online a photograph of an unmarked ballot with the handwritten text in the margin: "I support Scott Brown." But a voter would run afoul of the law by displaying online a photograph of a ballot

where Scott Brown was specifically marked as the voter's choice.  To determine whether either of these messages actually violates RSA 659:35(I) would require a government official to specifically review the contents of the photographed ballot itself.  This investigation into the content of speech to determine whether it should be treated disfavorably under RSA 659:35(I) reveals that the law is not content-neutral, but content-based.

And if there was any further doubt, *McCullen* also clarifies that a law is content based "if it [is] concerned with undesirable effects that arise from 'the direct impact of speech on its audience' or '[l]isteners' reactions to speech." *McCullen*, 134 S. Ct. at 2531.  Here, the State specifically disapproves of messages conveyed through the dissemination of marked ballots—including disseminations unrelated to voter corruption—because of perceived undesirable effects and its belief that such messages are somehow inherently harmful and "open the door for potential illegal acts to occur."  The Secretary of State's Office holds this belief even though it has presented no evidence that vote buying or voter coercion has occurred in over a century.  As the Deputy Secretary of State David Scanlan testified at deposition:

> Q:    And in the absence of any allegations of vote buying or voter coercion or voter intimidation, what is the harm in a voter of their own freewill without the supervision of a political boss or employer or anyone coercing them whatsoever of taking a picture of their ballot and posting that ballot online?
> A:    *Because it opens the door for potential illegal acts to occur*.  And it's no different than the situation prior to [HB] 366 passing of a voter walking out of the voting booth for the same reasons that you just described and holding their ballot up around the room to let everybody see that they have voted because they were proud of the fact that they had voted, or for whatever other reason.  There's no difference.  There's no difference between that individual doing that and somebody taking a digital photograph and sharing it on social media.
> ….
> Q:    And do—is it your view in your role as [deputy] secretary of state that Representative Rideout in his role as an elected official or even just as a citizen should be prohibited from publishing his marked] ballot on Facebook in order to further his goal of keeping the residents of Coos 7 informed of any and all laws happening at the state level that could affect lives—
> MR. LABONTE: Does your question imply that the ballot is marked, unmarked?
> MR. CHRISTIE: Marked.

MR. LABONTE: Okay.

A:      *He should be prohibited from showing his ballot*.

Biss. Aff. ¶ 4, <u>*Ex. C*</u> (Scanlan Depo. 37:21-38:11; 53:7-20) (emphasis added).  This is the very definition of a content-based regulation requiring strict scrutiny review.

Plaintiffs acknowledge that there is an ongoing debate among the Circuits about whether intentional discrimination is necessary to establish that a law is content based, and the U.S. Supreme Court may address this question this term in *Reed v. Town of Gilbert*.[10]  For example, one panel of the First Circuit Court of Appeals has stated that a law which, on its face, "restricts only some expressive messages and not others," still "may be considered content-neutral when the distinctions it draws are justified by a legitimate, non-censorial motive," rather than "animus." *See Thayer v. City of Worcester*, 755 F.3d 60 (1st Cir. 2014); *but see Matthews v. Town of Needham*, 764 F.2d 58, 60 (1st Cir. 1985) (using an objective standard where a speech regulation is content-based if it makes content-based distinctions on its face).[11]  But this pronouncement in *Thayer* was expressly rejected by the *McCullen* Court, which succinctly explained that a law is content based if it requires authorities to examine the content of speech to determine whether the law has been violated, or if the law is justified by listeners' reactions to particular speech.  In fact,

---

[10] In *Reed v. Town of Gilbert*, No. 13-503, the question presented is "[w]hether the Town of Gilbert's mere assertion that its sign code lacks a discriminatory motive renders its facially content-based sign code content-neutral and justifies the code's differential treatment of petitioners' religious signs."  Oral argument was held on January 12, 2015.  The sign code at issue in *Reed* imposes more stringent limitations on certain "temporary directional signs" that it imposes on "ideological" or "political" signs.  Before *Thayer*, the First, Second, Fifth,  Eighth, and Eleventh Circuits used a text-based test to determine the content-neutrality of sign ordinances.  *See Sol antic, LLC v. City of Neptune Beach*, 410 F.3d 1250 (11th Cir. 2005); *Neighborhood Enterprises, Inc. v. City of St. Louis*, 644 F.3d 728 (8th Cir. 2011) (holding sign ordinance exemptions content-based since "one must look at the content of the object."); *Nat'l Adver. Co. v. Town of Babylon*, 900 F.2d 551, 557 (2d Cir. 1990); *Serv. Emp. Int'l Union, Local 5 v. City of Houston*, 595 F.3d 588, 596 (5th Cir. 2010) ("A regulatory scheme that requires the government to examine the content of the message that is conveyed is content-based regardless of its motivating purpose."); *Matthews v. Town of Needham*, 764 F.2d 58, 60 (1st Cir. 1985).  The Fourth, Sixth, and Ninth Circuits use a motive-based test to determine the content-neutrality of a sign ordinance.  *See Brown v. Town of Cary*, 706 F.3d 294 (4th Cir. 2013); *H.D.V.-Greektown, LLC v. City of Detroit*, 568 F.3d 609 (6th Cir. 2009); *Reed v. Town of Gilbert*, 707 F.3d 1057 (9th Cir. 2013).  The Third Circuit uses a context-sensitive test to determine the content-neutrality of a sign ordinance.  *See Melrose, Inc. v. City of Pittsburgh*, 613 F.3d 380, 389 (3d Cir. 2010).

[11] On October 14, 2014, in light of *McCullen*, the plaintiffs in *Thayer* filed a petition for certiorari before the U.S. Supreme Court.  This petition is still pending.  *See* http://www.supremecourt.gov/search.aspx?filename=/docketfiles/14-428.htm.

case after case confirms that "animus" and a "censorial motive" are not needed for strict scrutiny to be applied to laws that on their face ban only certain messages. *See, e.g., Burson*, 504 at 197-98; *Carey*, 447 U.S. at 465 (strict scrutiny applied to law banning picketing near homes except for labor picketing); *Discovery Network*, 507 U.S. at 429 ("[D]iscriminatory … treatment is [not] suspect under the First Amendment only when the legislature intends to suppress certain ideas.") (quoting *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 117 (1991)). Simply put, even a "non-censorial" justification for RSA 659:35(I) would not save it from being deemed content-based and having to withstand strict scrutiny.

And *McCullen*'s statement of the law must be correct because imposing an intent requirement would undermine the very purpose of the First Amendment by allowing the government greater latitude to suppress the speech of disfavored groups. *See, e.g., Murdock v. Commonwealth of Pennsylvania*, 319 U.S. 105, 876 (1943) (otherwise neutral licensing requirements for door-to-door soliciting would constitute "a new device for the suppression of religious minorities"). Government officials who want to discriminate against certain categories of speech content typically know discrimination is prohibited and thus attempt to hide their discriminatory actions. It is in these situations that a rule requiring proof of intent is the most injurious, because it turns on facts not easily revealed in discovery or discerned by courts—namely, the mental state of government officials. Government officials do not typically announce their intent to discriminate against certain categories of speech. Instead, they try to hide discrimination behind seemingly neutral policies, and often offer post-hoc rationalizations for their behavior.[12] If every content discrimination claim required proof of discriminatory intent, the rule

---

[12] This is precisely why, in a host of contexts where discrimination is covert, the U.S. Supreme Court has "instruct[ed] that 'benign' justifications proffered in defense of categorical exclusions will not be accepted automatically; a tenable justification must describe actual state purposes, not rationalizations for actions in fact differently grounded." *United States v. Virginia*, 518 U.S. 515, 535-36 (1996); *cf. Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1268 (10th Cir. 2008) (McConnell, J.) ("We cannot and will not uphold [government action] that abridges an enumerated

against content discrimination would have little practical force, as this rule could easily be skirted by government actors.  In short, while intentional discrimination is sufficient to prove content discrimination, it is not necessary to do so. [13]

Accordingly, the principles in *McCullen* apply here.  Applying *McCullen*, RSA 659:35(I) is a content-based restriction on speech.

> **b.  Even If A Censorial Motive Was Required To Prove Content Discrimination (Which It Is Not), RSA 659:35(I) Is Content Based Because Such A Censorial Motive Exists Here.**

But even if the *Thayer* analysis applies—which it does not after *McCullen*—RSA 659:35(I) is nonetheless content based because the legislature passed it with the specific intent to censor speech with which it disagreed—namely, <u>all</u> speech made through the dissemination of marked ballots regardless of whether such speech is related to vote corruption.  *See Thayer*, 755 F.3d at 67 ("In determining whether a particular regulation is content-neutral, the principal enquiry

---

constitutional right on the basis of a factitious governmental interest found nowhere but in the defendants' litigating papers.").

[13] *Sorrell* is a prime example of this feature of speech jurisprudence.  In *Sorrell*, Vermont enacted a law that effectively prohibited the sale of prescriber-identifying information for "marketing" purposes, but allowed it for "educational communications" and other purposes. 131 S. Ct. at 2663.  The challenged statute also distinguished among the purchasers of prescriber-identifying information, specifically forbidding sales of that information to pharmaceutical manufacturers.  The *Sorrell* Court distinguished between the challenged law's purpose and its facial effects: "Formal legislative findings accompanying § 4631(d) confirm that the law's express purpose and practical effect are to diminish the effectiveness of marketing by manufacturers of brand-name drugs.  Just as the 'inevitable effect of a statute on its face may render it unconstitutional,' a statute's stated purposes may also be considered."  *Id.* (quoting *United States v. O'Brien*, 391 U.S. 367, 384 (1968)).  Thus, "[g]iven the legislature's expressed statement of purpose, it is apparent that § 4631(d) imposes burdens that are based on the content of speech and that are aimed at a particular viewpoint."  *Id.* at 2663-64 (emphasis added).  The Supreme Court further concluded that the "statute disfavors specific speakers, namely pharmaceutical manufacturers."  *Id.* at 2663.

The Supreme Court thus set out different ways that the same statute had violated the rule against content discrimination.  On one hand, the legislature's expressed purpose indicated that it was engaged in intentional discrimination among categories of content, as well as viewpoint discrimination.  But the "effect of a statute on its face" was a separate infirmity of the Vermont statute, as was the statute's discrimination among speakers.  Thus, the Vermont statute triggered strict scrutiny in four independent ways: (1) intentional content discrimination (apparent from the express purpose); (2) viewpoint discrimination (also apparent from the purpose); (3) facial content discrimination (apparent from the face of the statute); and (4) discrimination among speakers (apparent from the provision specially barring pharmaceutical manufacturers).  These independent First Amendment violations cannot be subsumed into a single category.  And the U.S. Supreme Court has never held that all forms of content discrimination can be collapsed into a single category of viewpoint discrimination.  Rather, "[v]iewpoint discrimination is … an egregious form of content discrimination."  *Rosenberger*, 515 U.S. at 829; *see also id.* at 829-30 (noting distinction between content and viewpoint discrimination in the context of a limited public forum).  It would stand First Amendment jurisprudence on its head to allow the narrower category of viewpoint discrimination to swallow the far broader category of content discrimination.

is 'whether the government has adopted a regulation of speech because of disagreement with the message it conveys.'") (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).  Put another way, the State specifically intended to ban speech through a marked ballot that <u>*had absolutely nothing to do with vote buying or voter coercion*</u> because it disfavors the message it conveys.  In short, the State's specific motive here was to censor.

This discriminatory intent is amply demonstrated in both the discovery record of this case and the legislative record.  First, the Secretary of State's Office made clear at deposition that it specifically intended to ban <u>*all*</u> online photographic displays of marked ballots—including those that constituted innocent political speech.  As the Secretary of State testified at deposition:

> Q.  So it's your testimony in your role as secretary of state that it should be illegal for an individual of their own accord to publish their own ballot through social media in order to advocate their political views?
> A.  Yes.
> Q.  All right.  And should it be illegal under the law of the state of New Hampshire for someone of their own accord to publish their ballot online in order to advocate a political position?
> A.  Yeah.  I don't—I mean, I told you what Hitler did, so...
> Q.  We'll get to Hitler in a second, but—
> A.  It's—the answer is—the answer is yes
> ….
> Q.      … Is it your testimony, I think it is, but I want to make sure, that an individual like my grandmother who because she wants people to know who she voted for or wants other people to vote for that same person publishes her ballot through social media, that she should be prosecuted for a violation-level offense in the state of New Hampshire?
> A.  Yes.
> ….
> Q.  And your answer about my grandmother should be prosecuted for a violation-level offense for publishing her ballot because she wants people to know who she voted for is the same even in instances where there's no allegation of vote bribery relating to her conduct?
> A.  Yes.
> Q.  And even—your answer is the same even when there's no allegation of coercion involved in her conduct?
> A.  Yes.

Biss. Aff. ¶ 2, <u>*Ex. A*</u> (Gardner Depo. 27:3-16; 59:15-22; 61:3-13).  And these innocent, political messages are specifically disfavored because the Office of the Secretary of State has a fear—albeit

a speculative fear not borne by any evidence—that such innocent messages *could* "allow [fraudulent] scenarios or activities to occur."  Biss. Aff. ¶ 4, *Ex. C* (Scanlan Depo. 22:23-23:10; 26:14-27:1; 28:10-20; 34:6-36:4; 37:21-38:11; 41:11-16; 53:7-20).  The Secretary of State even testified that he thought the innocent, political display of a marked ballot should be a misdemeanor offense, rather than a violation.  Biss. Aff. ¶ 2, *Ex. A* (Gardner Depo. 17:3-11).

Second, the legislative history indicates that the General Court specifically intended to ban innocent, political speech when it authorized the challenged law.  For example, during the March 8, 2014 public hearing on HB 366 before the House Criminal Justice and Public Safety Committee, the American Civil Liberties Union of New Hampshire testified that the bill "would sweep in a wide array of innocent speech by those who did not sell their votes."  Biss. Aff. ¶ 8, *Ex. G* (HB 366 Legislative History at 90-112 (104-05), March 6 and 18, 2014 House Criminal Justice Committee Materials on HB 366).  However, the Committee, like the House Election Law Committee before it, moved forward with the bill.  Indeed, on March 18, 2014, this House Committee specifically rejected by a vote of 5 to 10 a proposed amendment by Representative Steven Vaillancourt that would have ensured that HB 366 did not sweep within its scope innocent, political speech.  Under this amendment, HB 366's prohibitions would apply "only if the distribution or sharing is for the purpose of receiving pecuniary benefit, as defined in RSA 640:2, II(c), or avoiding harm, as defined in RSA 640:3."  *Id.* at 90-91, 93, 97-98.  And when the final version of HB 366 was recommended "ought to pass" by a majority of the House Criminal Justice and Public Safety Committee, the six Committee members in the minority prepared a "minority committee report" explaining how the bill would ban innocent, political speech: "[I]f this bill is to pass at all, the Minority suggests a further amendment which would clearly note that posting a photo of a ballot is only illegal if one does it for financial gain …. As the NHACLU … told the committee, this bill as drafted is overly broad.  As such it represents an intrusion on free speech."

23

*See* Biss. Aff. ¶ 8, *Ex. G* (HB 366 Legislative History at 82-89, March 19, 2014 Minority Report). As this evidence makes clear, the Secretary of State's Office and the legislature not only knew they were banning innocent speech unrelated to vote corruption, but had the specific goal to censor this form of speech.

> ### 2. Strict Scrutiny Applies Because RSA 659:35(I) Forbids The Dissemination Of Truthful And Lawfully-Obtained Information On A Matter Of Public Concern.

RSA 659:35(I) triggers strict scrutiny for yet another independent reason: the law forbids "the dissemination of truthful and lawfully obtained information on a matter of public concern." *Florida Star v. B.J.F.*, 491 U.S. 524, 541 (1989). Thus, the law "must meet a daunting standard"—namely, "punishment may lawfully be imposed, if at all, only when narrowly tailored to a state interest of the highest order[.]" *Id.* (statute prohibiting instruments of mass communication from publishing the names of rape victims failed strict scrutiny review); *see also Snyder v. Phelps*, 562 U.S. 443 (2011) (public speech, even if it is outrageous or hurtful, is protected and immune from civil liability under the First Amendment if it, in part, addresses "matters of public import on public property, in a peaceful manner"). Here, it cannot seriously be disputed that speech concerning an election is a "matter of public concern." The speech being suppressed by this law is not just imagery depicting the identity of the candidate for whom a person voted; rather, the law bans individuals from voluntarily using photographs of marked ballots to more broadly engage in political commentary and discuss both their experience at the polls and reasons for voting for certain candidates.

> ### 3. Applying Strict Scrutiny, RSA 659:35(I) Is Not Narrowly Tailored To Serve A Compelling Governmental Interest.

The only interest that the State claims RSA 659:35(I) advances is "to prevent voter fraud in the form of vote buying, intimidation, coercion and bribery." Biss. Aff. ¶¶ 3, 5, *Exs. B and D*

(State's Int. Resp. No. 8; Gardner Ex. 1; Scanlan Ex. 2); Biss. Aff. ¶ 8, *Ex. G* (HB 366 Legislative History at 113-20, Nov. 20, 2013 Election Law Committee Report); Biss. Aff. ¶ 4, *Ex. C* (Scanlan Depo. 46:15-47:12); Biss. Aff. ¶ 2, *Ex. A* (Gardner Depo. 92:12-20; 104:20-105:3). Even if this is a compelling interest, the State has no interest—let alone a compelling one—in regulating innocent, political speech far beyond the polling place that is unrelated to this asserted interest. *See Reno*, 521 U.S. at 875 ("It is at least clear that the strength of the Government's interest in protecting minors is not equally strong throughout the coverage of this broad statute."); Biss. Aff. ¶ 4, *Ex. C* (Scanlan Depo. 26:14-27:1; 28:10-20; 34:6-36:4) (acknowledging that the challenged law bans innocent, political speech); Biss. Aff. ¶ 2, *Ex. A* (Gardner Depo. 113:23-115:5; 122:7-123:9; 125:15-127:14) (same). Moreover, the State has presented no evidence indicating that vote bribery or voter coercion has occurred in New Hampshire since the late 1800s, let alone shown that a photograph of a marked ballot has ever been displayed online in New Hampshire as part of a vote corruption scheme. *See* Biss. Aff. ¶¶ 3, 5, *Exs. B and D* (State's Int. Resp. Nos. 18, 20; Gardner Ex. 1; Scanlan Ex. 2); Biss. Aff. ¶ 4, *Ex. C* (Scanlan Depo. 23:11-22); Biss. Aff. ¶ 2, *Ex. A* (Gardner Depo. 46:10-14; 48:6-13).

RSA 659:35(I) also cannot be viewed as a narrowly-tailored means of addressing vote buying and voter coercion when the law sweeps within its scope speech wholly unrelated to these interests—including the political speech engaged in by Plaintiffs. *See Reno*, 521 U.S. at 879 (Communications Decency Act of 1996 not narrowly tailored to the goal of protecting minors from potentially harmful materials given the "breadth of this content-based restriction of speech"); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 350 (1995) (ban on dissemination of anonymous campaign literature not narrowly tailored to interests of deterring fraud and libel because "the prohibition encompasses documents that are not even arguably false or misleading"). As explained above, in passing HB 366, the Secretary of State's Office and the legislature

25

specifically intended to ban all online photographic displays of marked ballots—including those that constituted innocent political speech.  However, it is already illegal to engage in vote bribery and voter coercion under RSA 659:40(I-II).  RSA 659:40(I-II) does not—unlike RSA 659:35(I)—sweep within its scope a wide array of innocent, political speech.

The U.S. Supreme Court's recent analysis in *McCullen v. Coakley* of whether Massachusetts' 35-foot reproductive health care facility buffer zone was narrowly tailored is instructive on this point.  There, the Court first observed that the law had reduced petitioners' opportunities to effectively speak with their intended audience through face-to-face communications.  *McCullen*, 134 S. Ct. at 2535.  The Court then explained that there were ample alternatives that would more directly address the government's asserted public safety interests without substantially burdening this speech, including "criminal statutes forbidding assault, breach of the peace, trespass, vandalism, and the like."  *Id.* at 2538.  The same is true here where the more narrowly-tailored response would be to aggressively investigate and prosecute violations of RSA 659:40.  *See also State v. Chong*, 121 N.H. 860, 862 (1981) (anti-leafleting law was unconstitutional because "[i]f the defendants were to litter, they could … be charged with that violation").  Of course, if a person publicly posts a picture of a marked ballot on the Internet showing how he or she voted (including in a situation where there was additional evidence of illegal activity), the State could easily identify and investigate the voter for a potential violation of RSA 659:40.

Nor has the State shown, whether in discovery or through legislative findings, that the posting of displayed ballots on the Internet is even linked to violations of RSA 659:40, let alone shown, as required by *McCullen*, "that it seriously undertook to address the problem with less intrusive tools readily available to it."  *McCullen*, 134 S. Ct. at 2539; *see also Reno*, 521 U.S. at 879 ("Particularly in the light of the absence of any detailed findings by the Congress, or even

hearings addressing the special problems of the CDA, we are persuaded that the CDA is not narrowly tailored if that requirement has any meaning at all."); *Ashcroft*, 542 U.S. at 668 ("Whatever the deficiencies of filters, however, the Government failed to introduce specific evidence proving that existing technologies are less effective than the restrictions in COPA.").  As the Secretary of State's Office testified in interrogatory responses and at deposition, prior to proposing HB 366, it conducted no studies concerning (i) whether RSA 659:40 is "insufficient to address vote buying and/or voter coercion in New Hampshire," (ii) whether the innocent display of marked ballots as a form of political speech would cause voter corruption to become more prevalent in New Hampshire society, or (iii) whether those who had engaged in the online posting of marked ballots were actually engaging in voter corruption.  Biss. Aff. ¶¶ 3, 5, *Exs. B and D* (State's Int. Resp. Nos. 14; Gardner Ex. 1; Scanlan Ex. 2); Biss. Aff. ¶ 4, *Ex. C* (Scanlan Depo. 24:14-26:13; 41:17-21; 42:4-8); Biss. Aff. ¶ 2, *Ex. A* (Gardner Depo. 118:15-120:14).  Nor has the State identified a single voter negatively impacted by another voter's innocent, political display of a marked ballot.  Biss. Aff. ¶ 2, *Ex. A* (Gardner Depo. 132:13-16).

This complete failure to investigate, let alone attempt, lesser restrictive alternatives is fatal under *McCullen*.  When it comes to laws restricting speech, the State is not permitted to shoot first, and aim later.  And the State's hypothetical and speculative parade of horribles that, without RSA 659:35(I), the "genie" of fraudulent activity that occurred in the late 1800s *could* be let "out of the bottle" cannot possibly be enough to suppress innocent political speech, especially when such conclusions are untethered to actual evidence.  *See State v, Brookins*, 844 A. 2d 1162, 1180 (Md. 2004) ("This Court is not willing to uphold a statute that restricts core political speech on the basis of such a speculative and unlikely, in any event, hypothesis."); *Citizens United*, 558 U.S. at 357 ("independent expenditures, including those made by corporations, do not give rise to corruption or the appearance of corruption"); *see also* Biss. Aff. ¶ 4, *Ex. C* (Scanlan Depo. 22:23-

23:10).  Nor can this Court simply "defer to the [legislative or bureaucratic] judgment that nothing less than a total ban [on photographic displays of marked ballots] would be effective in preventing" vote buying and voter coercion, especially when it undertook no detailed findings or studies on the subject.  *See Reno*, 521 U.S. at 875.

Any argument by the State that RSA 659:35(I) is a tailored regulation governing speech in polling places on election day also fails.  *See Burson*, 504 U.S. at 197 (law banning solicitation of votes and the display or distribution of campaign materials within 100-feet of the entrance to a polling place on election day survived strict scrutiny).  Unlike the law in *Burson* that was limited only to political speech on election day and at the polling place, RSA 659:35(I) is far broader in duration and scope.  Indeed, the legislative history of HB 366 makes clear that its intent was to change and expand then-existing law—which only impacted speech prior to the act of physically casting a ballot within a polling place—by now regulating speech occurring after one had voted, including speech occurring outside the polling place.  Biss. Aff. ¶ 3, *Ex. B* (Apr. 9, 2014 Senate Public and Municipal Affairs Hearing Report, Gardner Ex. 3) (Deputy Secretary of State Scanlan testifying that the law pre-HB 366 states that a "person cannot show their marked ballot prior to casting it" and that HB 366 would extend beyond Election Day where you could not take an image of the ballot and then post it the following day because it still creates the opportunity for potential fraud in terms of buying votes); Biss. Aff. ¶ 9, *Ex. H* (Recording of Apr. 9, 2014 Senate Public and Municipal Affairs Hearing) (20:30-22:20); Biss. Aff. ¶ 2, *Ex. A* (Gardner Depo. 67:20-68:20; 73:1-7; 76:5-11; 94:16-19).  For example, the challenged law indefinitely bans the posting of one's ballot on the Internet, including postings made *months or even years after the election*.  Biss. Aff. ¶ 4, *Ex. C* (Scanlan Depo. 28:11-20) (acknowledging lack of time limitation).  In Plaintiff Brandon D. Ross's case, he published his ballot on social media 10 days after the primary election.  AVC ¶ 40.  Any concerns the State may have about voter coercion on election day are only

relevant while the voting process is in progress, not weeks, months, or even years after the election.  In fact, RSA 659:35(I) contained such a temporal restriction before it was amended by HB 366, as it initially only limited the display of a marked ballot indicating how one is "about to vote."  Thus, the prior version of the law was effectively circumscribed to the disclosure of one's ballot in the polling place on election day before the ballot was actually cast.  *See* Biss. Aff. ¶ 4, *Ex. C* (Scanlan Depo. 20:2-22:1) (testifying that prior law "stopped at the point of dropping [the ballot] in the ballot box").  The current version of RSA 659:35(I), however, prohibits a voter from uploading to Facebook a photograph of a marked ballot *in places other than in the polling place*, including in the privacy of one's home.  In fact, all the plaintiffs in this case uploaded photographs of their marked ballot after they had left the polling place.  AVC ¶¶ 31, 35, 40.

RSA 659:35(I) also cannot possibly serve the purpose of protecting the victims of voter coercion because the statute actually penalizes the victimized voter who is alleged to have displayed his or her ballot to the coercing party, not the party who actually engaged in the coercing activity that the law is aimed at addressing.  As Deputy Secretary Scanlan testified at deposition:

> Q.  …. [RSA] 659:35 can be used to prosecute the—in my fact pattern the victims of vote bribery, voter coercion, voter intimidation?
> A. It could be used to prosecute those individuals that choose to show their ballot for whatever reason, yes.
> Q. Even if they're intimidated or coerced by their political or employment boss to do so?
> A. If they show their ballot, yes.

Biss. Aff. ¶ 4, *Ex. C* (Scanlan Depo. 45:13-21; 42:9-43:17).  Secretary of State William Gardner reiterated this point:

> Q.  …. So the statute as written doesn't punish the perpetrator of voter coercion, it punishes the victim of voter coercion, correct?
> A.  That's what the statute is about.

Biss. Aff. ¶ 2, *Ex. A* (Gardner Depo. 113:12-16).  If the goal is truly to prevent voter coercion and protect the victims of this unlawful act, it makes little sense to punish the victim.  Rather, the more

tailored approach to addressing this interest would be to prosecute the actual perpetrators of voter coercion to ensure that victims, rather than being fined themselves, are made safe from this unlawful practice in the future.

The State likely will argue that RSA 659:35(I) is necessary because a photograph of a marked ballot is the best evidence that a person who is selling a vote or has been coerced can present to a third party to prove that he or she voted a certain way.  In other words, the State's argument may be that this law makes it "easier" to address vote buying and voter coercion because it discourages an act that is necessary to consummate this illegal conduct.  This argument is flawed for at least three reasons.  *First*, as explained above, there is absolutely no evidence in the record suggesting that RSA 659:35(I) will actually keep the "genie in the bottle" by reducing the likelihood of vote buying or voter coercion occurring in New Hampshire.  Nor is there any evidence that a voter's innocent and political display of a marked ballot will somehow create a culture of voter corruption where other New Hampshire voters will be involuntarily compelled to display their own marked ballots to others. Biss. Aff. ¶ 4, *Ex. C* (Scanlan Depo. 22:23-23:10; 37:21-38:11; 41:11-16).  This lack of evidence indicates that the challenged law is far more likely to impact innocent political speech than unlawful voter corruption.  *Second*, even if it could be assumed that the law would, from time to time, deter an instance of vote bribery or voter coercion—again, an assumption which is unsupported—this would not solve the law's narrow tailoring problem or remedy the fact that the law sweeps within its scope innocent political speech. The First Amendment cannot be sacrificed for the sake of perceived efficiency.  *See Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002) ("The Government may not suppress lawful speech as the means to suppress unlawful speech.  Protected speech does not become unprotected merely because it resembles the latter.  The Constitution requires the reverse.").  As the U.S. Supreme Court recently made clear in *McCullen*, "[t]o meet the requirement of narrow tailoring,

the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *Id.* at 2540. In *McCullen*, surely a 35-foot buffer zone would have prevented the unlawful act of blocking clinic access, but the buffer zone still failed because it broadly swept within its scope innocent, protected speech. The challenged law here is no different. Even if it could somehow be shown that RSA 659:35(I) would lessen the incidents of voter corruption—which it cannot—it would still be unconstitutional. <u>*Third*</u>, even in the absence of the challenged law, institutional and societal factors already exist that have and will continue to limit the prevalence of this unlawful act, thus causing the law to impact more innocent speech than criminal conduct. In addition to the fact that the U.S. uses the "Australian ballot," these factors include the following: (i) increased societal wealth and economic development, which would make a single vote expensive, and thereby make the process of buying a large volume of votes needed to sway an election cost prohibitive;[14] (ii) given expanded population size and the large number of votes needed to sway an election, there are more efficient schemes to influence elections other than vote buying (like making large campaign contributions);[15] and (iii) the fact that existing law already bans vote buying and voter coercion and can be enforced.[16]

Simply because the challenged law implicates elections and perceived voter corruption does not, of course, immunize it from the normal, but rigorous, requirement that it be narrowly

---

[14] Allen D. Hicken, "How Do Rules and Institutions Encourage Vote Buying?" In Elections for Sale: The Causes, Consequences, and Reform of Vote Buying Frederic C. Schaffer, ed. Lynne Rienner. 2007. pp. 47-60, at 55 (noting that some scholars have argued that "[a]s incomes rise, the cost of vote buying will rise while the benefits decline, all else being equal, thus making other strategies more appealing …. As vote buying becomes more costly and more difficult to carry out logistically, candidates face incentives to switch from individual-level vote buying to strategies aimed at larger numbers of constituents using government resources, such as pork barreling and patronage"; however, arguing that "the relationship between development and vote buying is a matter for testing"), *available at* http://www-personal.umich.edu/~ahicken/index_files/votebuying.pdf.

[15] *Id.* at 56 ("Another electoral variable that can affect the expected utility of vote buying is district population size. All else being equal, the larger the district, the larger the amount of money required to buy a winning number of votes and the weaker or less dense the social networks needed to distribute money and monitor compliance.").

[16] *Id.* at 57 ("Perhaps the political factor that has the most direct impact on the expected utility of vote buying is the degree to which anti–vote buying rules and institutions exist and are enforced.").

tailored as a result of its impact on innocent political speech.  And multiple courts since *Burson v. Freeman*, 504 U.S. 191 (1992) have applied strict scrutiny to reject laws implicating elections that sweep within their scope innocent, political, and non-disruptive speech.  For example, in *State v, Brookins*, 844 A. 2d 1162 (Md. 2004), the Maryland Supreme Court struck down a state law, enacted to prevent election corruption, that prohibited candidates or others from paying persons for performing what were known as "walk around services" (such as distributing sample ballots) on election days.  There, the Court applied strict scrutiny and concluded that the law failed on narrow tailoring grounds:

> [T]he State's purported interest in corruption or apparent corruption of the electoral process by prohibiting vote-buying, endorsement buying or their appearance already is sufficiently covered by existing statutes.  Therefore, regarding the State's interest in preventing actual vote-buying … is superfluous and redundant and, thus, is not the least restrictive measure for achieving that goal …. In effect, considering the fact that Maryland already has statutes that criminalize vote-buying and voter-interference within 100 feet of the polling place, [the challenged law] addresses those areas where fraud and corruption may potentially creep into the electoral system.  *That justification, however, does not give the State the right to abridge speech because it paternalistically seeks to establish a completely fraud-free atmosphere within which the electorate is exposed only to the absolute untainted truth about political candidates or their platforms*."

*Id.* at 1179, 1181 (emphasis added). Similarly, in *CBS Broad., Inc. v. Cobb*, 470 F. Supp. 2d 1365 (S.D. Fla. 2006), the Court, as applied to exit-polling activities, struck down a Florida law that prohibited, among other things, the conducting of voter polling inside a polling place or within 100 feet of the entrance to any polling place.  There, the Court held that the Secretary of State "failed to provide any meaningful evidence that exit polling has any history of leading to voter intimidation, impeding voter access to the polls, or encouraging election fraud."  *Id.* at 1371.  The Court found particularly problematic the fact that the State sought to ban "all exit polling and reporters' interviews without any regard as to whether they are disruptive."  *Id.*  As a result, the Court concluded that, because "the statute so broadly restricts expressive activity, the State must use far more restrictive means in achieving its goal."  *Id.* at 1371-72.  This same analysis applies

here.  As in *Brookins* and *CBS*, (i) RSA 659:35(I) governs innocent speech outside the polling place that does not disrupt the act of voting, (ii) existing laws already address vote buying and voter coercion, and (iii) the State has failed to present any evidence that the innocent, political display of a marked ballot will cause others to engage in voter corruption.[17]

Accordingly, because RSA 659:35(I) cannot survive strict scrutiny, the law violates the First and Fourteenth Amendments to the United States Constitution.

### 4.    Even If RSA 659:35(I) Is Content-Neutral, It Fails Intermediate Scrutiny Due To Lack of Tailoring.

Even if the Court concludes that RSA 659:35(I) is a content-neutral restriction on speech analogous to a public forum time, place, and manner restriction and therefore applies intermediate scrutiny, the law would also fail this level of review.  *McCullen*, 134 S. Ct. at 2529 ("[E]ven in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.") (internal quotations omitted); *see also Doe v. Harris*, 772 F.3d 563 (9th Cir. 2014) (applying intermediate scrutiny to content-neutral law requiring disclosure of "Internet identifiers").  As explained above, like the content-neutral buffer zone in *McCullen*, RSA 659:35(I) cannot possibly be viewed as a narrowly-tailored means of addressing the State's interests in combatting voter corruption.

RSA 659:35(I) also fails under intermediate scrutiny because it does not provide alternative channels of communication, despite the State's contention that the law allows a voter to

---

[17]  Because strict scrutiny applies, it also no defense for the State to claim that RSA 659:35(I) does not offend the First Amendment because it "does not prohibit a voter from expressing who he or she has voted for" verbally or in writing. Biss. Aff. ¶¶ 3, 5, *Exs. B and D* (State's Int. Resp. No. 9; Gardner Ex. 1; Scanlan Ex. 2).  Setting aside the fact that this argument ignores the powerful imagery of a marked ballot, this argument is also irrelevant because RSA 659:35(I) regulates political speech on the basis of its content, thereby triggering strict scrutiny.  As a result, the "alternative channels" analysis typically done in evaluating content-neutral "time, place, and manner" restrictions is inapplicable here.  *See Reno*, 521 U.S. at 880.

verbally or in writing disclose for whom they vote.  First, as the U.S. Supreme Court explained in *Reno v. ACLU*, 521 U.S. 844 (1997), such a position "is equivalent to arguing that a statute could ban leaflets on certain subjects as long as individuals are free to publish books.  In invalidating a number of laws that banned leafletting on the streets *regardless of their content*—we explained that 'one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.'"  *Id.* at 880 (quoting *Schneider v. State*, 308 U.S. 147, 163 (1939)) (emphasis added).

Second, the law completely bans political speech through the dissemination of the powerful imagery of a marked ballot—an imagery that goes far beyond even demonstrating how one voted, but tells a message about one's voting experience.  AVC ¶¶ 3, 6 (Plaintiffs testifying as to powerful imagery of a ballot photograph).  Under the law, there is simply no way to use a photograph of a marked ballot to communicate an idea to a third party.  It should go without saying that the use of such visual imagery to convey a message is entitled to the same protections that are accorded all other forms of communication, including verbal communication, printed words, and publications by the press.  *See Hurley v. Irish-American Gay, Lesbian & Bisexual Group*, 515 U.S. 557, 569 (1995) ("[T]he Constitution looks beyond written or spoken words as mediums of expression …. [A] narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized message,' would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schoenberg, or Jabberwocky verse of Lewis Carroll.") (citation omitted); *Kaplan v. California*, 413 U.S. 115, 119-120 (1973) (explaining that photographs, like printed materials, are protected by the First Amendment); *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 924 (6th Cir. 2003) ("The protection of the First Amendment is not limited to written or spoken words, but includes other mediums of expression, including music, pictures, films, photographs, paintings, drawings,

engravings, prints, and sculptures."); *see also Regan v. Time, Inc.*, 468 U.S. 641, 678 (1984) (Brennan, J., concurring in part and dissenting in part) ("[t]he adage that 'one picture is worth a thousand words' reflects the common-sense understanding that illustrations are an extremely important form of expression for which there is no genuine substitute …. [A] statute that substantially abridges a uniquely valuable form of expression of this kind cannot be defended on the ground that, in appellant's judgment, the speaker can express the same ideas in some other way") (citations omitted).  Accordingly, RSA 659:35(I) also fails intermediate scrutiny.

**B.    RSA 659:35(I) Is Substantially Overbroad And, Therefore, Is Facially Unconstitutional Under The First Amendment.**

For all the reasons above, RSA 659:35(I) is also substantially overbroad.  A statute is overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Stevens*, 559 U.S. at 473 (internal quotation marks and citations omitted).  The Court's inquiry is not limited to the application of the challenged provisions to the particular plaintiffs before it, as "[l]itigants … are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973).

Here, RSA 659:35(I) is, on its face, overly broad because it restricts a substantial volume of constitutionally-protected political speech.  Where the prior version of RSA 659:35(I) was limited to banning the display of a marked ballot in a polling place prior to the ballot being cast on election day, RSA 659:35(I) now prohibits this same form of speech (i) far beyond the polling place, (ii) indefinitely after the date of the election, and (iii) without any nexus to vote corruption.

For example, the political speech that is swept within the scope of RSA 659:35(I) now includes the following:

a.  The publication on Facebook of a photograph of a marked ballot by an 18-year-old, newly-minted voter—or anyone else for that matter—who is excited about voting in her first presidential election and wishes to publicly show her enthusiastic support for a candidate using the powerful imagery of the very document she used to participate in the democratic process for the first time;

b.  The publication on Facebook by Plaintiff Andrew Langlois of a photograph of his marked ballot reflecting that he wrote in the name of his recently-deceased dog "Akira" as his Republican selection for the U.S. Senate to protest against the Senate candidates listed on the Republican ballot;

c.  The publication on social media by Plaintiff political candidates Leon H. Rideout and Brandon D. Ross of photographs of their marked ballots reflecting that they voted for themselves to demonstrate a sense of pride and enthusiasm in their candidacy;

d.  The publication on social media by Plaintiffs Leon H. Rideout and Brandon D. Ross of their marked ballots reflecting their political protest against RSA 659:35(I) for its violation of fundamental free speech rights;

e.  The publication on Instagram of a photograph of a marked ballot by a newly-minted American citizen who is excited about voting in his first American election after emigrating from war-torn Iraq following his life-threatening work as a translator for U.S. troops during the Iraq War;

f.  A newspaper editor's gift to a Senator of an encased and signed photograph of the editor's marked ballot voting for the Senator, bestowed in an effort to persuade the Senator to meet with the newspaper's editorial board; and[18]

g.  In the privacy of their own home, a husband's display of a photograph of his marked ballot to his wife days (or even months or years) after the election to show his pride for having supported certain candidates.

This speech is plainly protected under the First Amendment, and its regulation in no way effectuates the purpose of the law. *See McIntyre*, 514 U.S. at 346 ("[T]here is practically universal

---

[18] This example comes from a real experience of *Concord Monitor* editorial page editor Ralph Jimenez. *See* Biss. Aff. ¶ 25, *Ex. X* (Ralph Jimenez, "The Power of the Ballot Selfie," *Concord Monitor* (Nov. 13, 2014) ("[A photo of one's ballot] can also be a powerful form of speech, one that can influence political behavior. A longtime member and contributor to one party, for example, angered by its stance, could use a ballot photo to push his party to change direction. A ballot photo can be a force for good."), *available at* http://www.concordmonitor.com/home/14331672-95/my-turn-the-power-of-the-ballot-selfie).

agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs.").

In light of these examples of innocent, political speech that are now banned, RSA 659:35(I)'s overbreadth—and thus facial unconstitutionality—is apparent.  *See Free Speech Coalition*, 535 U.S. at 255 (Child Pornography Prevention Act of 1996's ban on virtual child pornography was unconstitutionally overbroad because it proscribed speech which was neither child pornography nor obscene).  Moreover, "[t]he possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted …."  *Broadrick*, 413 U.S. at 612.  This is precisely why the overbreadth doctrine exists—to "prohibit[] the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process."  *Free Speech Coalition*, 535 U.S. at 255.[19]

Finally, RSA 659:35(I) fails to realize the critical importance of online political speech under the First Amendment as well as to American culture.  For many people throughout New Hampshire—indeed, the United States—smart phones, the Internet, and social media platforms have become the predominant means for communication and public discourse.  "Through the use of chat rooms, any person with a phone line can become a town crier with a voice that resonates farther than it could from any soapbox.  Through the use of web pages, mail exploders, and newsgroups, the same individual can become a pamphleteer."  *Reno*, 521 U.S. at 870; *see also Clement v. Cal. Dep't of Corrs.*, 364 F.3d 1148, 1152 (9th Cir. 2004) (The First Amendment "protects material disseminated over the internet as well as by the means of communication devices used prior to the high-tech era").  Now, more than ever, "[t]he content on the Internet is as

---

[19] *See also Reno*, 521 U.S. at 880 (Communications Decency Act of 1996 was overbroad because it "suppress[ed] a large amount of speech that adults have a constitutional right to send and receive"); *Stevens*, 559 U.S. at 475 (federal criminal statute's ban on "depictions of animal cruelty" was overbroad because "[a] depiction of entirely lawful conduct runs afoul of the ban").

diverse as human thought." *Reno*, 521 U.S. at 870 (internal quotation marks and citation omitted). The ideas, opinions, emotions, actions, and desires capable of communication through the Internet are limited only by the human capacity for expression.  If First Amendment protections are to enjoy enduring relevance in the twenty-first century, they must apply with full force to speech conducted online and through social media platforms, especially where this speech is political in nature.  *See Citizens United*, 558 U.S. at 341 ("it is inherent in the nature of the political process that voters must be free to obtain information from diverse sources in order to determine how to cast their votes").  Because a substantial number of RSA 659:35(I)'s applications are unconstitutional, the law must be enjoined.

## II.    Plaintiffs Have Been And Will Be Irreparably Harmed By The Law.

Plaintiffs and members of the public will be irreparably harmed in the absence of a permanent injunction, especially where the State has stated publicly that it will continue to enforce the law.  AVC ¶¶ 4-5, 33-34, 37-38; *See* Biss. Aff. ¶ 7, *Ex. F* (Nov. 7, 2014 *Concord Monitor* Article).  Any loss of constitutional rights is presumed to be an irreparable injury.  *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Asociación de Educación Privada de Puerto Rico*, 490 F.3d at 21 (applying *Elrod* to irreparable harm component of permanent injunction analysis).  If the State is permitted to continue enforcing the law, Plaintiffs and others will be prohibited from exercising their First Amendment free speech rights to engage in political speech on matters of public importance that is wholly unrelated to the purported interests behind the law.  Even worse, Plaintiffs may be prosecuted, especially where the State has already prepared a complaint against Representative Rideout.  *See* Biss. Aff. ¶ 16, *Ex. O* (unserved complaint in Attorney General Rideout File).  Thus, Plaintiffs and members of the public will be irreparably harmed by the loss of their First Amendment rights if a permanent injunction is not granted.

### III.    The Balance Of Equities Favors Plaintiffs.

Plaintiffs' hardships if the injunction is not granted outweigh the State's interests if the injunction is granted.  As explained in Plaintiffs' Amended Verified Complaint, "Plaintiffs wish to continue engaging in this form of political speech that is prohibited by the plain language of RSA 659:35(I).  However, in light of the law's terms and the Attorney General's enforcement efforts, Plaintiffs reasonably believe that they will be investigated and prosecuted if they continue to do so.  Absent relief from this Court, Plaintiffs will be required to self-censor their expression or face punishment by the State.  Thus, the law is imposing and will continue to impose irreparable harm upon Plaintiffs' free speech activities unless it is enjoined."   AVC ¶ 42.   And, absent relief, Plaintiffs may be prosecuted.  In contrast, the State will not suffer any hardship if the injunction is granted, especially where it still has the ability to investigate and prosecute vote bribery and voter coercion under RSA 659:40(I-II).  Thus, the balance of hardships weighs in favor of Plaintiffs.

### IV.    The Public Interest Is Served By The Granting Of A Permanent Injunction.

The granting of a permanent injunction will benefit the public interest.  It is in the public's interest to protect constitutional rights.  *See Hyde Park Partners, L.P. v. Connolly*, 839 F.2d 837, 854 (1st Cir. 1988) ("obviously, should the statute be unconstitutional, the public interest would be adversely affected by denial of [] an injunction").  Granting a permanent injunction in favor of Plaintiffs would protect sacred freedom of speech principles.  Thus, the public interest is best served by the granting of the injunction.

### CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion, issue a declaration that RSA 659:35(I) violates the First Amendment, and issue a permanent injunction enjoining its enforcement.

Respectfully submitted,

LEON H. RIDEOUT, ANDREW LANGLOIS, and
BRANDON D. ROSS,

By and through their attorneys affiliated with the
American Civil Liberties Union of New Hampshire
Foundation,


*/s/ Gilles R. Bissonnette*
Gilles R. Bissonnette (N.H. Bar. No. 265393)
AMERICAN CIVIL LIBERTIES UNION OF NEW HAMPSHIRE
FOUNDATION
18 Low Avenue
Concord, NH  03301
Tel.:  603.224.5591
Gilles@aclu-nh.org

William E. Christie (N.H. Bar. No. 11255)
SHAHEEN & GORDON, P.A.
107 Storrs Street
P.O. Box 2703
Concord, NH  03302
Tel.:  603.225.7262
wchristie@shaheengordon.com


Dated:   March 27, 2015

## <u>CERTIFICATE OF SERVICE</u>

I, Gilles Bissonnette, hereby certify that a copy of the foregoing document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).  On the date of this filing, a copy of this document has also been sent by email to the following:

Stephen G. LaBonte (Stephen.LaBonte@doj.nh.gov)
Anne M. Edwards (Anne.Edwards@doj.nh.gov)
New Hampshire Department of Justice
33 Capitol Street
Concord, NH 03301

/s/ Gilles Bissonnette
Gilles Bissonnette