_____

)
LEON H. RIDEOUT,                              )
ANDREW LANGLOIS, and                         )
BRANDON D. ROSS,                             )
                                             )
    Plaintiffs,                          )
                                             )
v.                                           )     Civil Case. No. 1:14-cv-00489-PB
                                             )
WILLIAM M. GARDNER, Secretary of             )
State of the State of New Hampshire, in his  )
official capacity,                           )
                                             )
    Defendant                            )
_____)

## MEMORANDUM OF LAW ADDRESSING THE
## UNITED STATES SUPREME COURT DECISION
## IN REED V. TOWN OF GILBERT

Now comes the Defendant William M. Gardner, Secretary of State of the State of New Hampshire in his official capacity, by and through his counsel the New Hampshire Attorney General, and submits this memorandum of law addressing the United States Supreme Court Decision in Reed v. Town of Gilbert. On June 18, 2015 the United States Supreme Court issued its decision in the aforementioned case, as a result this Honorable Court requested that counsel brief how the Supreme Court's decision may impact this Court's ruling in the current matter. In response the Secretary of State pleads as follows:

## CASE BACKGROUND

The action was brought by pastor Clyde Reed and the Good News Church, a small, cash-strapped entity that owns no building, and as such, holds its services at elementary schools or other locations in or near the Town. *Reed v. Town of Gilbert*, 2015 U.S. LEXIS 4061, *10-11. The Church wished to advertise the time and location of their Sunday church services, which as

mentioned above, are held in a variety of different locations. *Id.* The Church began placing 15 to 20 temporary signs around the Town, frequently in the public right-of-way abutting the street, displaying the Church's name, along with the time and location of the upcoming service. *Id.* Church members would post the signs early in the day on Saturday and then remove them around midday on Sunday. *Id.* The display of these signs requires little money and manpower, and thus has proved to be an economical and effective way for the Church to let the community know where its services are being held each week. *Id.*

The Town's Sign Code compliance manager cited the Church twice for code violations. *Reed,* at *11. The Town's sign code prohibits the display of outdoor signs anywhere within the Town without a permit, exempting 23 categories of signs. *Id.* at *8. The Court found three categories of exempt signs relevant to the case. *Id.*

The first was "Ideological Sign[s]," included any "sign communicating a message or ideas for noncommercial purposes that is not a Construction Sign, Directional Sign, Temporary Directional Sign Relating to a Qualifying Event, Political Sign, Garage Sale Sign, or a sign owned or required by a governmental agency." *Id. citing* Gilbert, Ariz., Land Development Code ("Code"), ch. 1, §4.402 (2005), Glossary of General Terms (Glossary), p.23. This category is treated the most favorably of the three, allowing them to be up to 20 square feet in area and to be placed in all "zoning districts" without time limits. *Reed,* at *8.

The second category was Political Signs, which included "temporary sign designed to influence the outcome of an election called by a public body." *Id.* at *9. The Code allows the placement of political signs up to 16 square feet on residential property and up to 32 square feet on nonresidential property, undeveloped municipal property, and "rights-of-way." *Id. citing*

§4.402(I).  These signs may be displayed up to 60 days before a primary election and up to 15 days following a general election. *Id.*

The third category, which is the most relevant to the Church's signs is "Temporary Directional Signs Relating to a Qualifying Event," This includes any "Temporary Sign intended to direct pedestrians, motorists, and other passersby to a 'qualifying event.'" *Id.*  Under the Code, a "qualifying event" is any "assembly, gathering, activity, or meeting sponsored, arranged, or promoted by a religious, charitable, community service, educational, or other similar non-profit organization." *Reed,* at *9.  A temporary directional sign may be no larger than six square feet. *Id.* at 10 *citing* §4.402(P). They may be placed on private property or on a public right-of-way, but no more than four signs may be placed on a single property at any time and may be displayed no more than 12 hours before the "qualifying event" and no more than 1 hour afterward. *Id.*

The Court struck down the Town's Sign Code finding it to be content based on its face. Id. at 13.   As the Court noted the Code defined "Temporary Directional Signs" on the basis of whether a sign conveys the message of directing the public to church or some other "qualifying event." *Id.* at 15.  It defines "Political Signs" on the basis of whether a sign's message is "designed to influence the outcome of an election." *Id.,* at 15. And it defined "Ideological Signs" on the basis of whether a sign communicated a message or idea that do not fit in to the other categories. *Reed,* at *15.  Where the Code subjected the signs to different restrictions based on its category the application of the Code was entirely dependent on the communicative content of the sign.  *Id.*  at 16. The Court went on to say that since the Sign Code is a content-based regulation of speech on its face, there was no need to consider the government's justifications or purposes for enacting the Code to determine the level scrutiny. *Id.*

## STANDARD OF REVIEW

The Court in *Reed*, stated that "[a] law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Id. citing Cincinnati* v. *Discovery Network*, *Inc.,* 507 U. S. 410, 429, 113 S. Ct. 1505, 123 L. Ed. 2d 99. The Court further stated that "an innocuous justification cannot transform a facially content-based law into one that is content neutral." *Id.* A court must evaluate two questions before concluding that a law is content neutral, 1) whether a law is content based on its face, and, 2) whether the purpose and justification for the law is content based. *Id.*

## ARGUMENT

### I. RSA 659:35 is Not Facially Content-Based thus the Court Should apply Intermediate Scrutiny Considering the State's Justifications.

Up until now the focus of this litigation has been entirely on RSA 359:35, I, as amended by House Bill 366. In light of the Supreme Court's decision in *Reed* this Court must consider paragraph I of the statute in conjunction with paragraph II, when determining whether the statute is content-based on its face. *See* RSA 659:35, I; II. RSA 659:35, II, provides that "[n]o voter shall place a distinguishing mark upon his or her ballot nor write in any name as the candidate of his or her choice with the intention of thereby placing a distinguishing mark upon the ballot." Unlike the sign code in *Reed*, the two paragraphs read in conjunction with each other demonstrate that RSA 659:35 is not facially content-based because its application is not dependent on the content of the communication being conveyed on the ballot.

RSA 359:35, I, prohibits a voter from using his or her ballot as a manner of conveying how he or she is about to vote. RSA 359:35, II, prohibits the use of an official ballot as a

manner of conveying any other message, thereby making RSA 659:35, a reasonable manner restriction. *Reed* at *16. When explaining how a content based restriction can be viewpoint neutral the Court used the following analogy, "a law banning the use of sound trucks for political speech—and only political speech—would be a content-based regulation, even if it imposed no limits on the political viewpoints that could be expressed." *Id.* at *22. Unlike the sound truck political speech restriction in the example above and the sign code in *Reed*, RSA 659:35, in light of paragraph II, doesn't single out specific subject matter. For example, Joe, who owns Joe's Diner, while in the voting booth takes a photograph of his ballot on which he writes "after voting come in to Joe's Diner and check out our election day specials" and then posts that photograph on the Diner website. Joe is in violation of RSA 659:35, II, because by writing "after voting come in to Joe's Diner and check out our election day specials," Joe has placed distinguishing marks upon his ballot. As such the current circumstances are distinguishable from *Reed*.

II. **Ballots are Government Speech, Thus the State is Not Barred by the *Free Speech Claus*, when Determining what a Ballot is Allowed to Convey.**

On the same day as *Reed*, the Supreme Court released its opinion in *Walker v. Tex. Div., Sons of Confederate Veterans*. In that case that Court determined that the Texas Department of Motor Vehicles Board's rejection of a proposed specialty license plate design featuring a Confederate battle flag did not violate the first amendment. *See generally Walker v. Tex. Div., Sons of Confederate Veterans*, 2015 U.S. LEXIS 4063.

When government speaks, the Government not barred by the Free Speech Clause from determining the content of what it says. *Id.* at *10 *citing Pleasant Grove City* v. *Summum*, 555 U.S. 460, 467-468, 129 S. Ct. 1125, 172 L. Ed. 2d 853 (2009). This freedom in part reflects the fact that it is the democratic electoral process that first and foremost provides a check on government speech. *Id. citing Board of Regents of Univ. of Wis. System* v. *Southworth*, 529 U.S.

217, 235, 120 S. Ct. 1346, 146 L. Ed. 2d 193 (2000). As such, government statements, as well as

government actions and programs that take the form of speech, do not normally trigger the First

Amendment rules designed to protect the marketplace of ideas. *Id. citing* See *Johanns* v.

*Livestock Marketing Assn.*, 544 U.S. 550, 559, 125 S. Ct. 2055, 161 L. Ed. 2d 896 (2005).

Instead, the Free Speech Clause helps produce informed opinions among members of the public,

who are then able to influence the choices of a government that, through words and deeds, will

reflect its electoral mandate. *Id.* at *10-11 *citing* See *Stromberg* v. *California*, 283 U.S. 359, 369,

51 S. Ct. 532, 75 L. Ed. 1117 (1931).

When determining license plates were a form of governmental speech, the Court

considered first, the history of the license plate, *Id.* at 17, second, that the license plate designs

"are often closely identified in the public mind with the [State]," *Id.* at 17-18, third, the State

maintains direct control over the messages conveyed on its specialty plates.  *Id.*  at 18.

In the current case the State of New Hampshire has produced ballots to be used in its

elections since 1891. *See* Defendant's Memorandum of Law in Support of Summary Judgment,

Exhibit B, (1891 N.H. Laws Ch. 49, Sec. 10).  The ballots are prepared by the secretary of state

for purpose of expressing to the voters the names of those individuals, who are seeking office

and providing a mechanism for the voters to anonymously express their preference for

candidates. *See generally* RSA 656:1.   Lastly, the State maintains direct control of the ballots in

that a voter is given a ballot by the ballot clerk, RSA 659:13, the voter must then must proceed to

the voting booth to vote. RSA 659:15.  At no time can a ballot be taken outside the secured

parameter within the polling place prior to its close.  RSA 659:38.  Once the cast ballots have

been tabulated and the result has been announced and the return has been made, the moderator,

in the presence of the selectmen, is required place the cast, cancelled, and uncast ballots in

6

containers provided by the secretary of state and shall seal such container with the sealer provided by the secretary of state. RSA 659:95.

<u>CONCLUSION</u>

For the foregoing reasons above and in the Secretary of State's Memorandum of Law in Support of Defendant's Cross Motion for Summary Judgment, incorporated herein, this Court should grant summary Judgment in favor of the Secretary of State.

Respectfully submitted,

WILLIAM M. GARDNER,
Secretary of State of the State of
New Hampshire, in his official capacity,

By and through his counsel,

JOSEPH A. FOSTER
Attorney General

Dated: June 25, 2015 /s/ Stephen G. LaBonte
Anne M. Edwards (NH Bar # 6826)
Senior Assistant Attorney General
Stephen G. LaBonte (NH Bar # 16178)
Assistant Attorney General
N.H. Department of Justice
33 Capitol Street
Concord, NH 03301
603-271-3650

## Certificate of Service

I hereby certify that a copy of the foregoing was electronically served by ECF this 25th day of June 2015 to:

William E. Christie                           Gilles R. Bissonnette
Shaheen & Gordon, P.A.                  NH Civil Liberties Union
107 Storrs Street                             18 Low Avenue
P.O. Box 2703                                 Concord, NH  03301
Concord, NH  03302


/s/ Stephen G. LaBonte
Stephen G. LaBonte